[No. B229382. Second Dist., Div. Eight. Nov. 30, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSUE MANUEL MEJIA et al., Defendants and Appellants.

590

594

COUNSEL

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Josue Manuel Mejia.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Adam Perez.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Hernandez.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Caseros.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SORTINO, J.**[*]—A jury convicted appellants Josue Manuel Mejia, Adam Perez, Edwin Caseros, and Carlos Hernandez of the provocative act murder of Jesus Lorenzo. (Pen. Code, § 187, subd. (a).)[1] The jury determined the murder to be of the first degree and further found true a gang-murder special circumstance. (§ 190.2, subd. (a)(22).) The jury also convicted appellants of the willful, deliberate, and premeditated attempted murder of Leonardo Pulido (§§ 664, 187), attempted residential burglary (§§ 664, 459), and shooting at an inhabited dwelling (§ 246). With respect to all four counts, the jury found true a criminal street gang enhancement. (§ 186.22, subd. (b)(1).) With respect to the murder and attempted murder, the jury also found true an allegation that a principal intentionally discharged a firearm during the commission of a gang crime. (§ 12022.53, subds. (c), (e).)

The court sentenced Mejia to an aggregate term of 47 years to life plus 40 years in prison, calculated as follows: 25 years to life for the first degree murder, plus 20 years for the firearm enhancement; plus a "straight" life sentence for the attempted murder (minimum term of seven years), plus 20 years for the firearm enhancement on that count; plus 15 years to life for shooting at an inhabited dwelling.[2] The court imposed but stayed execution of the sentence on the attempted burglary conviction pursuant to section 654.

The court sentenced the remaining appellants identically. Each received an aggregate prison term of life without the possibility of parole (LWOP) plus 22 years to life, plus 40 years calculated as follows: LWOP for the first degree murder with a special circumstance plus 20 years for the firearm

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] The court imposed 25 years to life rather than life without the possibility of parole with respect to the murder conviction pursuant to section 190.5, subdivision (b).

enhancement; plus a "straight" life sentence for the attempted murder (minimum term seven years), plus 20 years for the firearm enhancement; plus 15 years to life for shooting at an inhabited dwelling. The court imposed but stayed execution of the sentence on the attempted burglary conviction pursuant to section 654.

In their individual briefs, appellants raise various issues. For the most part, each joins in different issues raised by his coappellants. For brevity, all issues either raised or joined by all appellants will be described as having been raised by appellants generally. Where not all appellants have either raised or joined an issue, those who have will be individually named.

With the exception of reducing or striking certain statutory fines imposed by the trial court, we affirm the judgments.

## STATEMENT OF FACTS

### A. *Appellant Perez's Motive to Kill Pulido*

Beginning in 2000, victim Pulido lived in a second-floor apartment in the 1900 block of West Clinton Street in Los Angeles. His mother, M.S., and his younger brother, C.C., also lived in the apartment with him.

Pulido used to visit the home of appellant Perez's aunt, M.P., which was about three or four blocks away from Pulido's apartment. When they were young, Pulido and Perez were friends and attended the same school. As they got older, however, their friendship waned and they would "mad dog" each other. Eventually, Perez, like his father before him, became a member of the 18th Street gang. Pulido joined the Big Top Locos, a rival gang.

Sometime in mid-2005, Perez and Pulido engaged in a verbal argument. Perez's father got involved and pushed Pulido. Pulido ran away because he feared Perez might get a gun and shoot him.

On another occasion, Perez called out "Big Twat"—a disrespectful reference to Big Top Locos—as Pulido walked by Perez's house. Pulido responded with "Fake Teen," an equally disrespectful reference to 18th Street. Perez got into his car, followed Pulido, and attempted to run him over.

In early October 2005, Perez again drove a car at Pulido. Appellant Mejia was riding in the front passenger seat at the time. To avoid being hit, Pulido ran away. Pulido also feared that Perez might shoot him. Because he was afraid for his safety, Pulido purchased a shotgun and kept it under his bed.

The day prior to October 12, 2005, 18th Street gang members came to Pulido's apartment looking for him. C.C. told Pulido about that incident. As a result, Pulido feared for both his and his family's safety.

B. *The October 12 Shooting*

At around 3:00 a.m. on October 12, 2005, M.S. and C.C. were asleep in the living room of the Clinton Street apartment. Both were awakened by several men knocking on the front door. M.S. did not open the door. One of the men asked for "Leo." M.S. told the men that Pulido was not at home. C.C. heard one of the men yell, "Leo," several times. The men also said that they were Pulido's "homies."

Pulido was sleeping in the back bedroom. His mother and brother woke him up and told him what was happening. Pulido was suspicious and frightened because his friends, who were all members of Big Top Locos, always called him by his gang moniker, "Bandit." Perez knew Pulido by the name Leo.

Pulido walked to the front door, where he heard whispering on the other side. He looked out an adjacent window and saw two men walking away. Pulido then looked out the kitchen window and saw the men walking towards the back of the apartment where his bedroom window faced the alley. He heard them throw something at his window.

Pulido returned to his room, retrieved his shotgun from under the bed, and loaded it with a single round. M.S. and C.C. remained in the living room. C.C. could hear rocks or shoes being thrown at the bedroom window, and also heard someone say, in Spanish, "Get in." Pulido saw the shadow of a man, whom the evidence later showed to be Lorenzo, climb through the bedroom window while holding a gun. When Lorenzo was about "halfway" through the window, Pulido shot at him once, and then did not see him anymore. At the time he shot, Pulido was in fear for his life and the life of his mother and brother.

Pulido reloaded the shotgun with a second round and looked out his bedroom window. He shot a second time at a car in the alley, to frighten anyone else away. He also saw two men running away.[3]

Pulido ran to his mother and told her to lock the doors and not go outside. Pulido ran out of the building and saw that everyone was gone. He then ran

---

[3] Police later recovered a shotgun pellet from the rear taillight of a car parked in the south parking lot of Pulido's building. Officers also observed damage to the rear of the vehicle consistent with having been hit by shotgun pellets.

away. As he ran away, Pulido heard gunshots. M.S. and C.C. also heard gunshots, as well as the sound of bullets hitting the side of the apartment building near their kitchen window. Police later observed bullet holes near the kitchen window.

Pulido ran to a park, got rid of the shotgun, and never returned to the apartment. He did not speak to the police about the incident until he was arrested in March 2009.

### C. *The Arrest of Appellant Mejia*

About 3:00 a.m. on October 12, 2005, Los Angeles Police Officer Paul Lopez and his partner, Officer Washington, were on patrol in the area of Alvarado and Kent Streets. They responded to a radio call about shots fired in the 1800 block of Clinton Street. As the officers drove down the 1800 block of Santa Ynez Street, they saw appellant Mejia crouching near a tree on the north side of the street. As the officers approached him, Mejia made a motion with his arm as if discarding something, and ran away. The officers eventually caught and arrested Mejia, and Lopez observed that Mejia's clothing was torn. Mejia also had scratches on his abdomen and wrists. Lopez returned to the area where Mejia had been crouching and recovered a blue steel revolver, which contained six expended shell casings.

Four expended bullets recovered from the parking lot south of Pulido's building, the wall of the building just below his kitchen window, and the interior wall of his living room had been fired from the revolver recovered from Mejia.

### D. *The Arrest of Appellant Caseros*

Police officers arrested appellant Caseros in the early morning hours of October 12, 2005, near Alvarado and Kent Streets. An ambulance took him to Los Angeles County+USC Medical Center where he was treated for shotgun pellet wounds to his right shoulder and right bicep.

### E. *Death of Jesus Lorenzo*

J.S. was the girlfriend of Lorenzo. Around 9:00 p.m. on October 11, 2005, Lorenzo dropped J.S. off at her house. Lorenzo was with appellant Hernandez. The two men had a "box of beer" that they were going to drink.

Early the next morning, J.S. was awakened by a telephone call from Hernandez. Hernandez told J.S. to go to the intersection of Alvarado and Kent Streets to pick up Lorenzo. "Some guy" in a car drove J.S. to that

intersection. There, she found appellant Perez. She also found Lorenzo in the backseat of a car. Lorenzo was nonresponsive and his chest was covered in blood.

The person who drove J.S. to the location helped J.S. place Lorenzo in the backseat of his car. They took Lorenzo to a local hospital where he died later that morning. Lorenzo's cause of death was a single shotgun wound to the chest, fired from a distance of less than two feet. Analysis of his blood showed an alcohol content between 0.17 and 0.19 percent. He also had cocaine in his bloodstream. At the time of his death, Lorenzo had several tattoos showing membership in the 18th Street gang.

### F. Admissions by Appellant Hernandez

Hernandez made a number of admissions about the shooting, both to J.S. and to another friend of Lorenzo's, J.B. Over defense objection, these statements were admitted in the joint trial pursuant to *People v. Greenberger* (1997) 58 Cal.App.4th 298 [68 Cal.Rptr.2d 61].

J.B. knew both Hernandez and Lorenzo. J.B. and Hernandez had been boyfriend and girlfriend during 2005. She considered Lorenzo her best friend. J.B. knew both men to be members of the 18th Street gang.

The day after the shooting, Hernandez told J.B. what had occurred. Before Lorenzo was shot, he and Hernandez had been drinking and were about to go to sleep. They received a phone call. Hernandez told Lorenzo not to give the caller the address, but Lorenzo did so anyway. Later, a third person came and picked both men up in a car. Hernandez went along even though he did not want to. Lorenzo was drunk and Hernandez wanted to have Lorenzo's back in case something happened. The person drove them to a rival gang member's house. This rival was a member of Big Top Locos. When they arrived at the house, Lorenzo yelled "18th Street" and started climbing onto the balcony. As he climbed the balcony, Lorenzo was shot and fell to the ground. Hernandez tried to drag Lorenzo away, but heard police sirens, got scared, and ran. Immediately after the shooting, Hernandez called J.S.

Hernandez also made admissions to J.S. The day after the shooting, he told J.S. that he was with Lorenzo when Lorenzo was shot. He and Lorenzo had been drinking earlier in the evening. Perez picked them up and took them to another location where they picked up two more people. The five men then drove to a rival gang member's apartment. Hernandez said he went with the men because Lorenzo was drunk.

### G. *Admissions by Appellant Caseros*

After his release from custody, Caseros also spoke to J.S. He said he wanted to clear up rumors that he had left Lorenzo to die. He said that Perez drove him, Hernandez, and Lorenzo to a rival gang member's apartment to "attack" him. They went to the front door, called out his name, and told him to come out. When he did not come out, they went to an alley to climb up a wall. Caseros saw that the rival had a gun, but Lorenzo did not care and tried to climb in the window. When Lorenzo got to the window, the rival gang member shot him in the chest. Caseros and Hernandez then tried to drag Lorenzo away, but the rival then shot Caseros. Both Caseros and Hernandez then ran away.

### H. *Arrest of Appellant Perez*

On October 15, 2005, Los Angeles Police Officer Benjamin Morales assisted in the arrest of Perez at his grandmother's residence near Alvarado Street. Morales noted scratch marks on Perez's right shoulder and damage to the left rear of Perez's green Infiniti. The damage to the car was the same height as damage to a building next to the alleyway behind Pulido's apartment.

### I. *Arrest of Appellant Hernandez*

Los Angeles Police Detective Mario Mota arrested Hernandez at his residence on 46th Street in Los Angeles on March 20, 2007. Mota observed 18th Street gang paraphernalia at the residence, including a shrine or memorial dedicated to Lorenzo.

### J. *Additional Forensic Evidence*

Swabs obtained from a blood trail that led from the driveway of Pulido's building to Alvarado Street matched Caseros's DNA.

Blood swabbed from plastic conduit attached to the wall near Pulido's bedroom and from the ground outside the apartment matched Lorenzo's DNA. Blood swabbed from the jeans worn by Mejia at the time of his arrest also matched Lorenzo's DNA. Finally, blood swabbed from the passenger side threshold of Perez's car also matched Lorenzo's DNA.

Criminalist David Purdy observed impressions from two different types of shoes on plastic conduit located below Pulido's window, between the first and second floors of the building. Criminalist Fadil Biraimah observed shoe impressions on wrought iron security bars attached to a window on the east

side of the building. Criminalist Ronald Raquel concluded that an impression from the wrought iron security bars was consistent with the right shoe worn by Lorenzo when he was shot. Several of the shoe impressions from the conduit were consistent with the shoes worn by Mejia at the time of his arrest.

### K. Additional Gang Evidence

Los Angeles Police Officer Edgar Hernandez testified as a gang expert regarding the 18th Street gang. According to Officer Hernandez, 18th Street and Big Top Locos were rival gangs.

Officer Hernandez concluded that appellants and Lorenzo were members of the 18th Street gang based on various facts. Perez previously admitted membership, had numerous tattoos, and associated with other 18th Street gang members. One of Perez's tattoos was a memorial to Lorenzo. Mejia had tattoos and associated with Perez. Caseros had 18th Street tattoos and associated with other 18th Street gang members. Appellant Hernandez had 18th Street tattoos, one of which was a memorial to Lorenzo. Finally, Lorenzo too was an 18th Street gang member: like the others, Lorenzo displayed 18th Street tattoos. Also, his brothers were members of the gang.

Officer Hernandez concluded appellants committed the October 12 incident for the benefit of the 18th Street gang. Based upon the facts of the case, Officer Hernandez opined that Lorenzo and the four appellants went to Pulido's apartment to kill him for disrespecting Perez and 18th Street. The act was intended to send a message that 18th Street was not to be "mess[ed] with," and that when someone "mess[es] with" one member, he has "to deal with the entire gang." Such an act of violence elevates the status within the gang of the various participants, but also elevates the status of the gang amongst its rivals by showing that it retaliates if crossed by other gangs.

### DISCUSSION

### A. Sufficiency of the Evidence: Substantive Counts

Appellants make various arguments challenging the sufficiency of the evidence underlying their convictions for (1) the first degree provocative act of murder of Lorenzo, (2) the willful, deliberate, and premeditated attempted murder of Pulido, and (3) attempted residential burglary. We reject each.

### 1. Standard of Review

An appellate court reviewing a challenge based on sufficiency of the evidence at trial must review the entire record in the light most favorable to

the People and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Put another way, the appellate court reviews the entire record in the light most favorable to the verdict and determines whether there is substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable juror could find the defendant guilty beyond a reasonable doubt. (*Ibid.*; see *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

When making such an evaluation, the appellate court does not reevaluate witness credibility or resolve conflicts in the evidence. Such matters are exclusively issues for the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [24 Cal.Rptr.3d 112, 105 P.3d 487].) Further, the reviewing court must accept logical inferences that the jury might have drawn from any circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].) While it is the jury's duty to acquit where circumstantial evidence is subject to two reasonable interpretations, one which points to guilt and one which points to innocence, it is the jury, not the appellate court, that must be convinced beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Where circumstances reasonably justify a jury's findings of fact, a reviewing court's conclusion that such circumstances might also reasonably be reconciled with contrary findings does not justify reversal. (*Id.* at p. 1054.)

## 2. *Provocative Act Murder*

Appellants were convicted of the first degree murder of their accomplice Lorenzo based upon the theory of provocative act murder.

Under the theory of provocative act murder, the perpetrator of an underlying crime is held liable for the killing of an accomplice by a third party. (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 581 [112 Cal.Rptr.2d 401] (*Briscoe*).) This theory may also apply where the third party inadvertently kills an innocent bystander in an attempt to stop the perpetrator's commission of the crime. (*People v. Cervantes* (2001) 26 Cal.4th 860, 867 [111 Cal.Rptr.2d 148, 29 P.3d 225] (*Cervantes*).) Reduced to its essence, the theory of provocative act murder may be stated as follows: "[W]hen the perpetrator of a crime—with a conscious disregard for life—intentionally commits an act that is likely to result in death and the crime victim kills in reasonable response to that act, the perpetrator is guilty of murder." (*Briscoe, supra*, 92 Cal.App.4th at p. 581; accord, *Cervantes, supra*, 26 Cal.4th at p. 868.) The classic provocative act scenario occurs when a perpetrator of the underlying crime instigates a gun battle, usually by firing first, and a police

officer, or victim of the underlying crime, responds with privileged lethal force by returning fire and kills the perpetrator's accomplice or, by inadvertence, an innocent bystander. (*Cervantes, supra,* 26 Cal.4th at p. 867.)

■ Provocative act murder has both a physical and a mental element which the prosecution must prove beyond a reasonable doubt. (*Briscoe, supra,* 92 Cal.App.4th at p. 582.) The *physical* element is satisfied when the defendant, or a *surviving accomplice* in the underlying crime, commits an act, the natural and probable consequence of which is the use of deadly force by a third party. (*Cervantes, supra,* 26 Cal.4th at pp. 868–869, 871; accord, *People v. Concha* (2009) 47 Cal.4th 653, 663 [101 Cal.Rptr.3d 141, 218 P.3d 660] (*Concha I*); see *Briscoe, supra,* at p. 582 & fn. 5.) When the defendant or surviving accomplice acts in such a manner and the third party kills in response, the provocateur can be said to have proximately caused the resulting death notwithstanding the intervening use of deadly force by the third party. (*Cervantes,* at pp. 868–869, 871, 873, fn. 15; accord, *Concha I,* at pp. 661–663.) And a participant in the underlying crime who does not actually commit a provocative act himself may nevertheless be vicariously liable for the killing caused by his provocateur accomplice based upon having aided and abetted commission of the underlying crime. (*Taylor v. Superior Court* (1970) 3 Cal.3d 578, 583, fn. 1 [91 Cal.Rptr. 275, 477 P.2d 131], overruled on other grounds in *People v. Antick* (1975) 15 Cal.3d 79, 92, fn. 12 [123 Cal.Rptr. 475, 539 P.2d 43]; see *People v. Garcia* (1999) 69 Cal.App.4th 1324, 1331 [82 Cal.Rptr.2d 254]; *People v. Superior Court (Shamis)* (1997) 58 Cal.App.4th 833, 845–846 [68 Cal.Rptr.2d 388]; *People v. Mai* (1994) 22 Cal.App.4th 117, 127–128 [27 Cal.Rptr.2d 141], disapproved on other grounds in *People v. Nguyen* (2000) 24 Cal.4th 756, 758, 765 [102 Cal.Rptr.2d 548, 14 P.3d 221].) Thus, under the provocative act doctrine, a defendant may be vicariously liable for the provocative *conduct* of his surviving accomplice in the underlying crime. (*Concha I,* at pp. 660, 663, 665.)[4]

■ With respect to the *mental* element of provocative act murder, a defendant cannot be vicariously liable; he must personally possess the requisite mental state of malice aforethought when he either causes the death through his provocative act or aids and abets in the underlying crime the provocateur who causes the death. (*Concha I, supra,* 47 Cal.4th at pp. 660,

---

[4] As stated above, for the theory of provocative act murder to apply, the defendant or one of his surviving accomplices must commit a provocative act that proximately causes the killing of an accomplice or innocent bystander. If the only provocative act is attributable to the deceased accomplice, his surviving accomplices may not be held liable for murder in connection with his death. This is because the deceased participant alone proximately caused his own death. Since one cannot be criminally liable for murder in connection with one's own death, one's surviving accomplices in the underlying crime cannot be vicariously liable for murder either. (*People v. Antick, supra,* 15 Cal.3d at pp. 90–91; *Briscoe, supra,* 92 Cal.App.4th at p. 582, fn. 5.)

662–663.) When a defendant intentionally acts with the specific intent to kill, or aids and abets in the underlying crime with same state of mind, he demonstrates express malice. (*Id.* at p. 662; see *Cervantes, supra*, 26 Cal.4th at pp. 872–873, fn. 15.) When a defendant, with conscious disregard for human life, intentionally acts in a manner inherently dangerous to human life or, with the same state of mind, aids and abets in the underlying crime, he demonstrates implied malice. (*Concha I*, at p. 662; see *Cervantes*, at p. 868; *Briscoe, supra*, 92 Cal.App.4th at p. 583.)

If the underlying crime which provokes the killing does not require an intent to kill, the provocative conduct must be an act beyond that necessary simply to commit the crime. (*Briscoe, supra*, 92 Cal.App.4th at pp. 582–583; *People v. Gallegos* (1997) 54 Cal.App.4th 453, 460 [63 Cal.Rptr.2d 382].) Where the underlying crime requires an intent to kill, however, conduct necessary to commit the crime is sufficient to constitute the provocative act. (*In re Aurelio R.* (1985) 167 Cal.App.3d 52, 59–60 [212 Cal.Rptr. 868]; accord, *People v. Gallegos, supra*, at pp. 460–461.)

■ Provocative act murder may be either of the first or second degree. (*Concha I, supra*, 47 Cal.4th at p. 663; *Cervantes, supra*, 26 Cal.4th at p. 873, fn. 15.) When the defendant acts with express malice alone or with implied malice, provocative act murder is of the second degree. When the defendant acts with express malice and is also willful, deliberate, and premeditated, it is murder of the first degree. (*Concha I, supra*, at p. 663; *Cervantes, supra*, at p. 873, fn. 15; see § 189.) Again, for purposes of murder, a defendant cannot be vicariously liable for the mens rea of his accomplice in the underlying crime. (*Concha I, supra*, at p. 665.) The defendant must personally act with the state of mind required for either first or second degree murder. (*Id.* at pp. 663–664.)

"Willful" is synonymous with "express malice": in other words, a specific intent to kill. (*People v. Moon* (2005) 37 Cal.4th 1, 29 [32 Cal.Rptr.3d 894, 117 P.3d 591].) Premeditation occurs when the killing is " 'considered beforehand,' " and deliberation occurs when the decision to kill is " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*Ibid.*; accord, *People v. Perez* (1992) 2 Cal.4th 1117, 1127 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], sets forth three types of evidence ordinarily used to establish premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. Although the *Anderson* factors provide, essentially, a " 'synthesis of prior case law,' " they " 'are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case.' [Citations.]" (*People v. Mayfield, supra*, 14 Cal.4th at p. 768.) To sustain a verdict of first degree murder based upon premeditation and deliberation, evidence of all three *Anderson* categories is not required. (*People v. Perez, supra*, 2 Cal.4th at p. 1125.)

### 3. *Willful, Deliberate, and Premeditated Attempted Murder*

■ Attempted murder requires (1) a specific intent to kill and (2) a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730].) Unlike murder, an attempted murder therefore requires express malice and cannot be proved based upon a showing of implied malice. (*People v. Bland* (2002) 28 Cal.4th 313, 327 [121 Cal.Rptr.2d 546, 48 P.3d 1107].) Also, unlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement. (*People v. Bright* (1996) 12 Cal.4th 652, 665–669 [49 Cal.Rptr.2d 732, 909 P.2d 1354], overruled on other grounds in *People v. Seel* (2004) 34 Cal.4th 535, 541 [21 Cal.Rptr.3d 179, 100 P.3d 870].)

### 4. *Attempted Residential Burglary*

■ Attempted burglary requires two elements: (1) the specific intent to commit burglary and (2) a direct but ineffectual act toward its commission. (See *People v. Toledo* (2001) 26 Cal.4th 221, 229 [109 Cal.Rptr.2d 315, 26 P.3d 1051].) Burglary ordinarily requires (1) unlawful entry into a building with (2) the intent to commit theft or *any* felony. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041 [31 Cal.Rptr.2d 128, 874 P.2d 903]; see § 459.) Entry of an inhabited dwelling house with the requisite intent is burglary of the first degree. (§ 460, subd. (a).) With exceptions not applicable here, all other burglaries are of the second degree. (§ 460, subd. (b).)

A person charged with an attempted crime may be convicted of such even if the evidence at trial shows that the crime was completed. (§ 663.)

### 5. *Aiding and Abetting*

■ Principals in the commission of a crime include both the direct perpetrator of the crime and those who aid and abet the commission of the

crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; see § 31.) A person aids and abets commission of a crime when, with knowledge of the perpetrator's unlawful purpose, he, by act or advice, encourages or facilitates commission of the crime with the specific intent to do so. (*People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) Additionally, an aider and abettor is guilty not only of any intended crime, but also of any offense committed that is the natural and probable consequence of that crime. (*McCoy, supra*, at p. 1117.)

### 6. *Sufficiency of the Evidence*

Based upon the evidence presented at trial, the jury's verdicts on the substantive counts are entirely justified. The jurors could reasonably conclude, based upon the evidence presented and inferences derived from it, all of the facts that follow.

First, although the incident did not end up as planned, it began as an orchestrated attempt to kill Pulido. Setting aside, for the moment, the evidence that connects each appellant to the incident, a simple generic description of its material facts demonstrates a planned attack by whoever was specifically involved. The day prior to the shooting, a group of 18th Street gang members went to a rival gang member's house and asked for him. At 3:00 o'clock the next morning, a group of 18th Street gang members, armed with at least two firearms, returned to the rival's apartment. They initially pretended to be friends and called for him to come outside. When the rival refused to come outside, at least one of the group claimed "18th Street," and all or part of the group moved to the alley behind the apartment. Two of the group, both armed, attempted to climb into the second-floor apartment by scaling the wall and crawling through the window. The only thing that stopped them from accomplishing their goal was a defensive shotgun blast fired by their intended victim. Based upon these facts, the jurors could reasonably conclude that the shots fired by Pulido were a natural and probable response to a planned and coordinated attempt by a group of armed rival gang members to kill him.

Second, the evidence demonstrates that each appellant was part of the group that attacked Pulido that morning. We shall separately address the evidence against each appellant.

Perez and Pulido belonged to rival gangs and, additionally, personally did not like each other. In the months prior to the shooting, the two physically fought and, on two occasions, Perez tried to run Pulido down with a car.

In addition to this evidence of motive, other evidence ties Perez to the October 12 incident. Lorenzo's blood was found in Perez's car and damage to

his car was consistent with damage to a wall in the alley behind Pulido's apartment. Caseros told J.S. that Perez drove him and the others to Pulido's apartment that night. When J.S. went to the intersection of Alvarado and Kent Streets to help Lorenzo after the shooting, Perez was present.

The evidence also shows that Mejia participated in that attack. Like Perez, he was an 18th Street gang member and thus had a motive to kill Pulido. Evidence of his general motive was corroborated by his participation in one of Perez's earlier attempts to run Pulido over with a car.

Mejia was arrested shortly after the shooting, only blocks from the crime scene. Lorenzo's blood was on his clothing. The revolver Mejia possessed immediately prior to his arrest fired the bullets embedded in the exterior and interior of Pulido's apartment. Mejia fled the scene when spotted by Officers Lopez and Washington. His clothing was torn and he had scratches on his abdomen and wrists. His shoes were consistent with impressions removed from the conduit leading to Pulido's second-floor bedroom window.

With respect to Caseros, he admitted to J.S. both that he was at Pulido's apartment that night and that he knew it was the home of a rival gang member. He admitted that the plan was to "attack" the rival gang member. He admitted to being part of the group that went to the front door and called for Pulido, and then went to the alley to "climb up a wall" when Pulido refused to come out.

Apart from his admissions, Caseros too was arrested near the crime scene shortly after the shooting, and he had shotgun wounds to his shoulder and bicep. He, like the other appellants, was a member of 18th Street and thus had a motive to kill Pulido.

Finally, with respect to Hernandez, he too admitted to being part of the group that went to Pulido's apartment. He admitted that Perez picked up him, Lorenzo, and two others, and drove to the home of a rival Big Top Locos gang member. Hernandez claimed he did not want to go, but went along because Lorenzo was drunk and Hernandez "wanted to have [Lorenzo's] back." According to Hernandez, at the scene Lorenzo claimed 18th Street, began to climb into the apartment, and was shot by Pulido. Hernandez tried to drag Lorenzo away, but got scared when he heard police sirens. Later, Hernandez called J.S. so she could take Lorenzo to the hospital. Apart from his admissions, Hernandez was also an 18th Street gang member and thus had a motive to kill Pulido.

Based upon the facts summarized above, the jury could reasonably con-clude that Perez wanted to kill Pulido, planned the October 12 attack to

accomplish that goal, and recruited his fellow 18th Street gang members, including Lorenzo, to assist. The jury could also conclude that Mejia, while armed, followed Lorenzo up the wall in an attempt to enter the bedroom and kill Pulido, and also fired the shots back at the apartment in response to Pulido's shotgun blasts. Finally, the jury could also conclude that Caseros and Hernandez were part of the group at Pulido's front door, that they eventually moved along the side of the apartment to the back alley, and that they were there to assist or "back up" their fellow gang members in the plan to kill Pulido.

■ These conclusions sufficiently demonstrate the following facts: (1) appellants and Lorenzo were part of an orchestrated plan to kill Pulido; (2) each—including Lorenzo—aided and abetted the others in the attempt to kill Pulido; (3) Pulido's initial shotgun blast was the natural and probable consequence not only of Lorenzo's attempt to enter the bedroom but of a whole series of provocative acts that began at the front door, continued along the side of the apartment, and ended in the back alley; and (4) Lorenzo's decision to climb the wall and attempt entry into the bedroom, if not specifically discussed or encouraged as part of the plan to kill Pulido, was certainly a foreseeable possibility of that plan if Pulido refused to come outside. Thus, the evidence supports each appellant's convictions for (1) first degree provocative act murder; (2) willful, deliberate, and premeditated attempted murder; and (3) attempted residential burglary.

In response to this evidence, each appellant makes a number of arguments, none of them convincing. Perez contends that (1) Caseros's statement to J.S. shows that Perez remained in his car while Lorenzo, Hernandez, and Caseros made their independent decisions to call out Pulido at the front door and then climb the wall when that plan failed; (2) the evidence is not consistent with a plan to kill Pulido because it is unlikely that the group would have murdered Pulido in front of his apartment with so many possible neighborhood witnesses; (3) the evidence is not consistent with a plan to kill Pulido because "a drive-by shooting would have been a much more effective way" to accomplish that goal; (4) Pulido's version of the shooting is self-serving and not believable; (5) Lorenzo was too obese to climb the wall, he therefore did not present an imminent threat, and thus Pulido's shooting was not a reasonable response to a provocative act but was itself murder; and (6) Lorenzo's "reckless" decision to climb the wall was his own drunken decision, not attributable to Perez, and thus an independent intervening cause of his own death. These arguments are nothing more than an effort to get us to reweigh the evidence after a jury verdict, which is not our job when reviewing a verdict for sufficiency of the evidence. Accordingly, we reject them.

Likewise, Mejia argues that the evidence connecting him to the crime is susceptible to inferences consistent with innocence: (1) the shoe impressions on the conduit do not definitively match his shoes; (2) the scratches on his body and torn clothing could have happened anywhere at any time and do not show that he climbed the conduit or was even present in the alley; and (3) his possession of the revolver and the presence of Lorenzo's blood on his clothing do not establish where he was when he came into contact with Lorenzo and obtained possession of the weapon. Mejia argues that he coincidentally could have been in the neighborhood, heard Pulido's shots, encountered Lorenzo and the others as they fled Pulido's apartment, and then assisted his fellow gang members by helping to carry Lorenzo and taking custody of the revolver. He argues that this version of events is supported by Caseros's statement, which does not mention Mejia, and Pulido's testimony, which describes only two people at the front door and only two people running away after the shooting. These arguments, like those of Perez, are nothing more than a request of this court to reweigh the evidence. Again, that is not our role on appeal.

Caseros and Hernandez offer a different argument, although it too is ultimately without merit. They contend that no surviving accomplice committed a provocative act and, therefore, that no survivor can be liable for Lorenzo's death. The only provocative act, they argue, was that of Lorenzo himself, climbing the wall and attempting to enter the bedroom.

While Lorenzo's conduct may have been the immediate cause of his death, it does not absolve appellants of responsibility: " 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening cause is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*Cervantes, supra*, 26 Cal.4th at p. 871.) Most importantly, the issue of causation is a factual question, ordinarily to be decided by the jury. (*Ibid.*)

This argument of Hernandez and Caseros fails because it views the incident far too narrowly. The jury could conclude that Pulido was fearful the moment he became aware there were individuals calling his name and demanding he come outside. Thus, the provocative nature of this incident began when appellants, members of a rival gang, showed up at Pulido's apartment at 3:00 a.m. with the intent to kill him. When Pulido refused to exit the apartment despite their demands, they did not abandon their efforts and leave. Instead, they moved along the side of the apartment, conduct Pulido correctly interpreted as movement towards his bedroom which prompted him to return to that room to retrieve and load his shotgun. Once in the alley behind the apartment, the group threw things at Pulido's bedroom window. All of this conduct occurred before Lorenzo and Mejia climbed the wall to the bedroom window while armed with handguns. All of this conduct, especially in light of Perez's prior attempts to run Pulido over with a car, was itself provocative. And Lorenzo's decision to climb the wall and enter Pulido's window, while ill advised, was an entirely predictable outcome of the plan to kill Pulido once Pulido refused to come outside. Lorenzo's conduct, although intervening, was not independent of the prior provocative conduct of his accomplices and thus does not exonerate them from liability for his death.

Hernandez makes additional arguments: (1) he did not have an intent to kill; (2) he only "reluctantly" accompanied the group to Pulido's house to protect his drunken friend; (3) he did not have a gun; and (4) no one identified him as a person at the front door or in the back alley. Some of these facts are irrelevant. Others ask us to make inferences contrary to those reasonably made by the jury. None warrant reversal.

B. *Gang-murder Special Circumstance/Enhancement and Provocative Act Murder*

Appellants also challenge the sufficiency of the evidence in support of the gang-murder special circumstance, the criminal street gang enhancement, and the enhancement for discharge of a firearm by a principal during a gang crime. Before we address these issues, however, we must first address an issue raised by trial counsel in the court below: whether the gang-murder special circumstance can apply where liability for first degree murder attaches based upon the theory of provocative act murder. Pursuant to Government Code section 68081, we requested additional briefing on this issue and the similar issue of whether the criminal street gang enhancement can apply to murder where liability is based upon the same doctrine.

### 1. *The Gang-murder Special Circumstance*

Section 190.2, subdivision (a), sets the penalty at death or life without the possibility of parole for all first degree murders wherein the finder of fact also determines that at least one of a number of listed special circumstances is true. Section 190.2, subdivision (a)(22), sets forth the elements of the gang-murder special circumstance: "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." The electorate enacted section 190.2, subdivision (a)(22), as part of Proposition 21 in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64–65 [40 Cal.Rptr.3d 750, 130 P.3d 519].)

Section 190.2, subdivision (c), extends liability for section 190.2, subdivision (a)(22), and all other special circumstances: "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true . . . ." Section 190.2, subdivision (c), essentially extends liability for any special circumstance to accomplices of the actual killer who aid and abet with an intent to kill. (See *People v. Souza* (2012) 54 Cal.4th 90, 110, fn. 6 [141 Cal.Rptr.3d 419, 277 P.3d 118]; *People v. Bonilla* (2007) 41 Cal.4th 313, 331, fn. 5 [60 Cal.Rptr.3d 209, 160 P.3d 84]; *People v. Jones* (2003) 30 Cal.4th 1084, 1117 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Estrada* (1995) 11 Cal.4th 568, 573 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

The fundamental task of statutory construction is to ascertain legislative intent so as to effectuate the purpose of the law. (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].) When construing statutes, we look first to the words of the statute, which should be given their usual, ordinary, and commonsense meaning. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324].) Where the language of a statute is clear and unambiguous, we go no further. (*Ibid.*) Only if the statutory language is ambiguous do we consult " 'extrinsic aids,' " such as the objects to be achieved by the statute, its legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which it is a part. (*Ibid.*; see *Wilcox v. Birtwhistle, supra*, at p. 977.) In such a situation, we must select the construction that comports most closely with legislative intent, with a view towards promoting rather than defeating the statute's general purposes. (*People v. Montes* (2003) 31 Cal.4th 350, 356 [2 Cal.Rptr.3d 621, 73 P.3d

489].) We construe voter initiatives enacted into law according to the same principles applied to statutes enacted by the Legislature. (*People v. Elliot* (2005) 37 Cal.4th 453, 478 [35 Cal.Rptr.3d 759, 122 P.3d 968].)

Section 190.2, subdivision (a)(22), by its express terms contains three basic elements: (1) the defendant must intentionally kill the victim; (2) while an active participant in a criminal street gang; (3) in order to further the activities of the gang. The first and third elements, on the facts of this case, are the elements at issue. We conclude, based upon the interplay between the language of section 190.2, subdivision (a)(22), and the theory underlying provocative act murder as set forth in *Cervantes* and *Concha I*, that the special circumstance applies in the immediate context.

■ *Cervantes* and *Concha I* make absolutely clear that provocative act murder is not a unique or independent crime. It is simply a type of murder where causation, though sufficient, is somewhat more attenuated than that which occurs when the defendant is the actual killer: "Provocative act murder is not an independent crime with a fixed level of liability. (*Cervantes, supra*, 26 Cal.4th at p. 867, fn. 10.) It is simply a type of murder. The words 'provocative act murder' are merely shorthand used 'for that category of intervening-act causation cases in which, during commission of a crime, the intermediary (i.e., a police officer or crime victim) is provoked by the defendant's conduct into [a response that results] in someone's death.' (*Id.* at pp. 872–873, fn. 15.)" (*Concha I, supra*, 47 Cal.4th at p. 663; see *People v. Gardner* (1995) 37 Cal.App.4th 473, 476 [43 Cal.Rptr.2d 603].)

Thus, a defendant who commits the requisite provocative act proximately, and therefore legally, causes the resulting death despite the intervening act of the third party. And to the extent any of his accomplices in the underlying crime do not commit their own provocative acts (and thus legally cause the death as well), they nevertheless share responsibility for the murder as aiders and abettors of the underlying crime so long as they have the requisite mental state of malice aforethought. (*Taylor v. Superior Court, supra*, 3 Cal.3d at p. 583, fn. 1; see *People v. Garcia, supra*, 69 Cal.App.4th at p. 1331; *People v. Superior Court (Shamis), supra*, 58 Cal.App.4th at pp. 845–846; *People v. Mai, supra*, 22 Cal.App.4th at pp. 127–128.)

■ These principles demonstrate that the gang-murder special circumstance defined in section 190.2, subdivision (a)(22), can apply to provocative act murder. To the extent a defendant, with express malice, premeditation, and deliberation, proximately causes a death by committing the requisite provocative act, he has intentionally killed the ultimate victim despite the intervening use of deadly force by a third party, thus proving the first element. This is so even though the ultimate victim may be his partner in

crime. (See *People v. Bland, supra,* 28 Cal.4th at p. 323 [murder requires an unlawful intent to kill a person, not the person intended to be killed].) And, to the extent a defendant is not the actual provocateur, he may nevertheless be liable for the special circumstance as an accomplice of the provocateur in the underlying crime pursuant to the vicarious liability provisions of section 190.2, subdivision (c): the "actor" he aids and abets is not the actual killer, but his accomplice in the underlying crime whose provocative act proximately causes death through a third party.

We also conclude that the third element is satisfied. The motive of the actual killer in the context of a provocative act murder, we concede, may be to thwart the activities of the criminal street gang. Nevertheless, if the course of conduct initiated by the provocateur or his accomplices that proximately causes the killing is originally intended to further the activities of the gang, the resulting murder can be said to have been "carried out to further the activities" of the gang.

Moreover, this construction is consistent with and strongly supported by the electorate's purpose in enacting Proposition 21. The title of the proposition was the Gang Violence and Juvenile Crime Prevention Act of 1998. (*People v. Shabazz, supra,* 38 Cal.4th at p. 65.) Based upon an exhaustive review of ballot materials, the Supreme Court has previously concluded that its purpose, in part, was to make life without the possibility of parole or death available for " 'murderers who kill as part of any gang-related activity.' [Citation.]" (*Ibid.,* italics omitted.) The express words of the statute, especially when considered in this context, fairly support the interpretation we have given it.

### 2. *The Gang Enhancement*

█ We also conclude that the gang enhancement may apply in the context of a provocative act murder.

Section 186.22 adds various sentencing enhancements for gang-related felonies. For purposes of the enhancements, subdivision (b)(1) of that section requires that the felony be committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." This portion of section 186.22 requires proof of only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. (*People v. Albillar* (2010) 51 Cal.4th 47, 67 [119 Cal.Rptr.3d 415, 244 P.3d 1062].) It does not require proof that a defendant acted with the specific intent to promote, further, or assist a gang. (*Ibid.*)

For the same reason that a provocative act murder—notwithstanding that it results in the death of a fellow gang member—can be construed as furthering the activities of a gang, it may also be found to have benefitted the gang and to have been committed with the intent to promote criminal conduct by gang members. Again, while the actual killer may act with the motive of stopping gang activity, the course of conduct set in motion by a provocateur or his accomplices that legally causes the murder may benefit the gang and be committed with the requisite specific intent. More importantly, section 186.22, subdivision (b)(1), is also established when the felony not only benefits the gang but also when it is committed "in association" with any gang member. As the immediate case shows, it is clear that the killing of one gang member by another through the intermediary of a third party using privileged lethal force can be committed "in association" with other gang members.

## C. Sufficiency of the Evidence: Special Circumstance and Enhancements

We now address appellants' challenge to the sufficiency of the evidence in support of the gang-murder special circumstance, the criminal street gang enhancement, and the enhancement for discharge of a firearm by a principal during a gang crime. Again, none of appellants' arguments have merit.

### 1. Standard of Review

This same standard of review applicable to the review of substantive charges also applies when evaluating the sufficiency of the evidence in support of a special circumstance or enhancement found true. (See *People v. Wilson* (2008) 44 Cal.4th 758, 806 [80 Cal.Rptr.3d 211, 187 P.3d 1041] [enhancement].)

### 2. The Criminal Street Gang Special Circumstance and Enhancements

The elements of the gang-murder special circumstance pursuant to section 190.2, subdivision (a)(22), and the gang enhancement pursuant to section 186.22, subdivision (b)(1), are discussed above and will not be repeated here.

■ Section 186.22, subdivision (b)(1), is incorporated into section 12022.53, subdivision (c). Ordinarily, section 12022.53, subdivision (c), adds a 20-year enhancement whenever a defendant personally discharges a firearm during the commission of certain specified felonies, including murder and attempted murder. Section 12022.53, subdivision (e), however, expands liability for this enhancement to *any principal* in the commission of a crime so

long as (1) he is found in violation of section 186.22, subdivision (b), and (2) any principal discharges a firearm during the commission of the specified felony.

### 3. *Sufficiency of the Evidence*

Perez, specifically, contends the attack on Pulido and the criminal offenses that resulted were motivated by a personal disagreement between the two and not for the benefit of the 18th Street gang. Specifically, Perez contends that Pulido testified the incident was personal and that Pulido's testimony should control. Further, Perez contends that the only evidence which supports the gang-related nature of the attack is the opinion evidence of Officer Hernandez which, as a matter of law, is insufficient. Neither contention has merit.

 First, whatever Pulido's opinion of the shooting, it is not controlling. As discussed above, the validity of a gang enhancement depends upon proof of the elements set forth in section 186.22, subdivision (b)(1), not upon a lay person's opinion of whether or not something is "gang related." Second, contrary to Perez's argument, Officer Hernandez's opinion was not the only evidence offered in support of the gang allegations: Officer Hernandez's opinion was based on a number of independent facts that supported it.

Insofar as the section 186.22 and section 12022.53 enhancements are concerned, the evidence is more than sufficient. Perez and Pulido may have had personal enmity between them, but they were also members of rival gangs, a fact which the jury could reasonably conclude would enhance their mutual animosity. Prior to the incident, Perez and Pulido ridiculed each other by calling the other's *gang* by a disparaging nickname. Perez took fellow 18th Street gang members with him to commit the crime that night, not persons unrelated to the gang. At least one member of the group that night claimed "18th Street" prior to the attack, which the jury could reasonably conclude was to ensure that any witnesses knew who was responsible. These facts were independent of Officer Hernandez's opinion. His opinion merely interpreted these facts and explained to the jury that (1) the attempted murder was retaliation for the prior act of disrespect towards 18th Street and one of its members; (2) participation would enhance the reputation of those involved within the 18th Street gang; (3) commission of the crime would enhance the reputation of 18th Street in relation to other gangs; and (4) notoriety resulting from the crime would let the community know that if someone crossed a member of 18th Street, he should be prepared to take on the entire gang. This evidence is more than sufficient to establish that the attack on Pulido was

committed for the benefit of or in association with a criminal street gang with the specific intent to further or assist criminal conduct by gang members.[5]

The gang-murder special circumstance requires that the murder be "carried out to further the activities" of the gang. (§ 190.2, subd. (a)(22).) Largely for the same reasons as discussed above in connection with the section 186.22 and section 12022.53 enhancements, the evidence is sufficient to support the special circumstance found true in this case. The jury could reasonably conclude that the attack on Pulido was committed by 18th Street gang members against a rival in retaliation for disrespect towards 18th Street. Commission of such an attack elevated the gang in comparison to other gangs and sent the message that an attack on a member was an attack on the entire gang. Such facts fully support a finding that the attempted murder of Pulido, which resulted in the provocative act murder of Lorenzo, was carried out to further the activities of the 18th Street gang.

### D. *CALJIC No. 8.12*

During its charge to the jury, the trial court used CALJIC No. 8.12 to define provocative act murder. Appellants contend that this instruction as read contained numerous errors, each of which requires reversal. We reject appellants' contentions.

#### 1. *Individual Premeditation and Deliberation*

Appellants first contend that the instruction allowed each to be convicted of first degree murder without a finding that each personally acted with express malice, as well as willfully, deliberately, and with premeditation. Instead, appellants contend, the instruction allowed the jury to convict each so long as it found that a single accomplice acted with the requisite state of mind. We disagree.

As mentioned above, the Supreme Court in *Concha I* specifically held that to be convicted of murder, a defendant cannot be vicariously liable for the

---

[5] Caseros also contends that the section 12022.53, subdivision (c), enhancement must be reversed because the evidence shows that Mejia, the principal who discharged the firearm during the incident, fired the shots back at the apartment after both the attempted murder of Pulido and the murder of Lorenzo were complete. Thus, according to Caseros, Mejia did not discharge the firearm "in the commission of" the felonies, as required by section 12022.53, subdivision (c). This argument is not convincing: a firearm is discharged in the commission of a crime so long as the discharge and the felony are part of one continuous transaction, including flight after the felony to a place of temporary safety. (*People v. Frausto* (2009) 180 Cal.App.4th 890, 902 [103 Cal.Rptr.3d 231].) In the immediate case, Mejia fired his weapon shortly after Pulido fired his, while appellants were inferentially still in the immediate vicinity and attempting to flee. Thus, Mejia's shots occurred "in the commission of" the underlying felonies.

mens rea of his accomplice; he must personally act with malice aforethought and, for first degree murder, must personally act with express malice, as well as willfully, deliberately, and with premeditation. (*Concha I, supra*, 47 Cal.4th at pp. 660, 665–666.) CALJIC No. 8.12, as used by the trial court in this case, read, in pertinent part, as follows: "Murder which occurs during the commission of the underlying crime of attempted murder is murder of the first degree if a defendant personally acted willfully, deliberately, and with premeditation during the attempted murder. The word 'willfully' means intentionally. The word 'deliberately' relates to how a person thinks, and means formed or arrived at or determined upon as a result [of] careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditation' relates to when a person thinks and means considered beforehand. One premeditates by deliberating before taking action." The CALJIC committee specifically added this paragraph in spring 2010 to address *Concha I*'s requirement that a defendant personally act with the requisite mens rea. (Com. to CALJIC No. 8.12 (Spring ed. 2010) p. 383.)

Notwithstanding the Committee's express purpose, appellants contend that the instruction runs afoul of *Concha I* because the reference to "*a* defendant" rather than to "*the* defendant" allowed the jury to convict all of them so long as any one of them had the requisite mens rea. We reject this contention for a number of reasons.

First, the claim is forfeited: "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].) Here, the instruction was a correct statement of the law: fairly read, the instruction states that *a* defendant is guilty of first degree murder only if *he personally* acted willfully, deliberately, and with premeditation. Indeed, Perez, in his opening brief, expressly concedes this fact: "CALJIC No. 8.12 [as given by the trial court] was a correct instruction, telling the jury that they must make an individual assessment of each defendant's mens rea on [the murder count]." Since no appellant below requested clarification of this otherwise correct statement of the law, appellants have forfeited this claim.

Second, on the merits this argument fails. When deciding a claim of instructional error, the reviewing court looks not only at the challenged instruction, but at the instructions as a whole in the context of the entire trial record. (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331 [52 Cal.Rptr.2d 256].) Here, CALJIC No. 8.12, when read in the context of the entire charge to the jury, accurately defined the state of mind required of each defendant for a finding of first degree provocative act murder. CALJIC

No. 1.11 told the jurors that any reference to "defendant" in the instructions applied to "each defendant" unless the instruction said otherwise. CALJIC Nos. 17.00 and 17.02 collectively told the jurors that the guilt of each defendant on each count must be decided separately from all other defendants and all other counts. These instructions reinforced the otherwise plain meaning of CALJIC No. 8.12, that each defendant must have individually acted willfully, deliberately, and with premeditation before he could be convicted of first degree murder.

Finally, were we to find error in the instruction—which we do not—it was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*); *People v. Concha* (2010) 182 Cal.App.4th 1072, 1085 [107 Cal.Rptr.3d 272] (*Concha II*).) The evidence in support of the verdicts in this case is summarized above in connection with our resolution of appellants' challenges to its sufficiency. As discussed above, the evidence was overwhelming that the attack on Pulido began as a planned attempt to kill him and that each appellant intentionally participated in that attack. Further, not only does the evidence reasonably support the jury's verdict, but it is such that beyond a reasonable doubt, any rational jury would still have found that each appellant acted willfully, deliberately, and with premeditation, even absent the error alleged by appellants. (See *Concha II, supra,* at p. 1089.)

### 2. *Alternative Theory of First Degree: Attempted Burglary*

Pursuant to CALJIC No. 8.12, the trial court also instructed the jury as follows: "[m]urder, which occurs during the commission or attempt to commit the crime of residential burglary, when there was in the mind of the perpetrators of that crime, the specific intent to commit murder, is murder of the first degree." Appellants contend that this portion of CALJIC No. 8.12 was prejudicial error.

Appellants first argue that this instruction violates *Concha I* since it allows conviction for first degree murder without a jury determination that each appellant acted with premeditation and deliberation, but upon a finding only that the appellant committed burglary or attempted burglary with the intent to kill. Appellants also argue the instruction was error because, at the time of the immediate crimes, burglary murder could not be used to set the degree of provocative act murder when the intent underlying the burglary was the intent to kill.

We conclude that although the instruction may have been problematic in its use of burglary murder as a basis for establishing first degree provocative act

murder, it does not warrant reversal. Our analysis, though, first requires a brief history of the relation between felony murder and provocative act murder.

In *People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130] (*Washington*), the Supreme Court held that the felony-murder rule applies only when "the act of killing [is] committed by the defendant or by his accomplice acting in furtherance of their common design." The court observed that the common law doctrine of felony murder, incorporated into section 189, attributes malice only to those who kill in the " 'perpetration [of] or attempt to perpetrate' " the listed felonies. (*Washington*, at p. 780.) Thus, the rule may not be used to attribute malice to a defendant when the killing is committed by the crime victim or a police officer in an effort to *thwart* the commission of a listed felony. (*Id.* at p. 781.)

Later that same year, the Supreme Court supplemented *Washington* by formally articulating the doctrine of provocative act murder. In *People v. Gilbert* (1965) 63 Cal.2d 690, 704 [47 Cal.Rptr. 909, 408 P.2d 365],[6] the court, after acknowledging its limitation of the felony-murder rule in *Washington*, stated the doctrine of provocative act murder: "When the defendant or his accomplice, with conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life." Most important, for the purpose of the issue currently before us, the *Gilbert* court next reached an additional holding: although the felony-murder rule cannot be used to impute *malice* when neither the defendant nor his accomplice in the underlying crime actually commits the killing, section 189 may be used to establish the *degree* of the murder if malice—and therefore murder—is otherwise proved. (*People v. Gilbert, supra*, 63 Cal.2d at p. 705.) Thus, a provocative act murder which occurs when a defendant acts with implied malice may nevertheless be first degree murder if it occurs during the course of a section 189 felony. (*People v. Gilbert*, at p. 705; accord, *People v. Sanchez* (2001) 26 Cal.4th 834, 852–853 [111 Cal.Rptr.2d 129, 29 P.3d 209]; *People v. Caldwell* (1984) 36 Cal.3d 210, 216–217, fn. 2 [203 Cal.Rptr. 433, 681 P.2d 274]; *Pizano v. Superior Court* (1978) 21 Cal.3d 128, 139–140, fn. 4 [145 Cal.Rptr. 524, 577 P.2d 659]; *People v. Baker-Riley* (2012) 207 Cal.App.4th 631, 635–636 [143 Cal.Rptr.3d 737].) This is so because even though the actual *killing* is not committed to perpetrate the underlying felony, the *provocative act* which makes the killing a murder is. (*Pizano v. Superior Court, supra*, at pp. 139–140, fn. 4.)

---

[6] Judgment vacated on other grounds in *Gilbert v. California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].

*Concha I*, as discussed above, focuses on first degree provocative act murder based on a finding of express malice plus premeditation and deliberation. *Concha I*, however, did not overrule *People v. Gilbert* or the other, more recent cases, cited above. Had the Supreme Court wished to overturn the use of felony murder to set degree, it would have done so. We conclude, therefore, that section 189 still may be used to elevate an implied malice provocative act murder to first degree so long as the *provocative act* which prompts the third party's use of lethal force occurs during the commission of a section 189 felony.

▉▉▉ This, however, does not end our analysis. In *People v. Wilson* (1969) 1 Cal.3d 431, 439–440 [82 Cal.Rptr. 494, 462 P.2d 22] (*Wilson*), the Supreme Court held that the felony-murder rule did not apply to a killing committed during a burglary where the burglary was based on entry with the intent to assault the homicide victim with a deadly weapon. Relying on the merger doctrine announced in *People v. Ireland* (1969) 70 Cal.2d 522, 539–540 [75 Cal.Rptr. 188, 450 P.2d 580], the *Wilson* court reasoned that one who enters a building with the felonious intent to assault the ultimate homicide victim will not be deterred by the felony-murder rule. For deterrence to have an effect and, thus, for the felony-murder rule to apply, the felony intended upon entry cannot be an integral part, factually, of the charged homicide. (*Wilson, supra,* at pp. 440–441; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140, fn. 7 [124·Cal.Rptr.2d 373, 52 P.3d 572].) The felony intended upon entry must be, instead, "a felony independent of the homicide." (*Wilson,* at p. 440.) For this reason, a burglary based upon entry with the specific intent to kill the homicide victim likewise cannot support a finding of first degree felony murder. (*People v. Seaton* (2001) 26 Cal.4th 598, 646 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

In *People v. Farley* (2009) 46 Cal.4th 1053, 1116–1117, 1119–1120 [96 Cal.Rptr.3d 191, 210 P.3d 361] (*Farley*), the Supreme Court overruled *Wilson*, noting that its holding ignored the plain language of section 189 and, further, led to "questionable distinctions" and "analytical anomalies." After *Farley*, so long as the homicide occurs during a burglary, as statutorily defined, the felony-murder rule applies and the homicide is first degree murder. (*Farley,* at p. 1121.) Because of the ambiguity created by *Wilson* and the 30 years of jurisprudence that followed it, however, the *Farley* court limited its holding by making it prospective only. (*Farley,* at pp. 1121–1122.)

Given the timing of appellants' crimes, therefore, *Wilson* remains the applicable law. The precise issue before this court though, is, to the extent *Wilson* would have prevented the use of section 189 to make it first degree felony murder had appellants succeeded in killing Pulido, does *Wilson* also prevent the use of section 189 to set the degree of appellants' liability for

Pulido's provocative act killing of Lorenzo. The parties' briefing ignores this issue and we could find no case on point.

We need not decide this issue to resolve this appeal. Even if we assume the instruction was error, reversal is not required because any error was harmless beyond a reasonable doubt. (*People v. Chun* (2009) 45 Cal.4th 1172, 1204 [91 Cal.Rptr.3d 106, 203 P.3d 425]; see *Chapman, supra,* 386 U.S. at p. 24.) *Wilson* notwithstanding, the language complained of nevertheless required the jury to find that "the perpetrators" harbored the specific intent to "murder" Pulido at the time of the attempted entry into his bedroom window. Thus, the instruction required the jury to find that each appellant not only acted with express malice but that the requisite intent was formed prior to the attempted entry of the residence. By definition, such an instruction necessarily includes a finding of premeditation and deliberation. (See *Farley, supra,* 46 Cal.4th at p. 1120 [felony-murder rule "unnecessary" where defendant commits burglary with the intent to kill].) Thus, the error, if any, was harmless. (See *People v. Chun, supra,* at p. 1204 [instruction which sets forth invalid theory of liability harmless when it is impossible, upon the evidence, to have found what the verdict did find without also finding the contested point].)

Additionally, as discussed earlier in this opinion, the evidence was overwhelming that each appellant arrived at the scene that night for the purpose of killing or assisting in the killing of Pulido. The attack on Pulido, inferentially, took a substantial period of time, from appellants' arrival at the apartment to the shooting in the alley. Given this record, there is simply no rational way to view such evidence except as establishing, beyond a reasonable doubt, express malice, premeditation, and deliberation. Even if the court had omitted the language complained of by appellants, beyond a reasonable doubt a rational jury would still have found that each appellant acted willfully, deliberately, and with premeditation. (See *Concha II, supra,* 182 Cal.App.4th at p. 1089; cf. *People v. Chun, supra,* 45 Cal.4th at pp. 1204–1205 [there is not a single standard to determine *Chapman* error, but various standards].)

### 3. *Act Independent of Felony/High Probability of Lethal Response*

CALJIC No. 8.12, as given by the trial court, instructed that there were two underlying crimes upon which the jury could base liability: (1) attempted murder and (2) attempted residential burglary. Appellants contend that the instruction was error because it failed to instruct further that if the jury relied on the underlying crime of attempted burglary, it must additionally find that (1) the provocative act involved conduct beyond that inherent in the commission of the burglary and (2) appellants knew there was "a high probability" of the act causing a lethal response from a third party.

Appellants are correct that provocative act case law has traditionally required proof of the above elements. (See, e.g., *Briscoe, supra*, 92 Cal.App.4th at pp. 582–583; *People v. Gallegos, supra*, 54 Cal.App.4th at pp. 460–461; *In re Aurelio R., supra*, 167 Cal.App.3d at pp. 57–59.) These additional elements, however, are not required where the underlying crime requires an intent to kill. (*People v. Gallegos*, at pp. 460–461; *In re Aurelio R.*, at pp. 59–60.) Although burglary and attempted burglary do not require, in the abstract, an intent to kill, the attempted burglary in this case did: the trial court instructed the jury that, insofar as the immediate case was concerned, burglary required (1) unlawful entry of a building (2) with the specific intent to commit "murder." As such, the underlying crime of attempted residential burglary in this case required the jury to find a specific intent to kill. We therefore find no error in the instruction as given.

### E. *CALJIC No. 3.00*

Next, appellants contend that the trial court's use of CALJIC No. 3.00 conflicted with CALJIC No. 8.12 and allowed the jury to convict them of first degree murder without first finding that each acted with the requisite mens rea. In a related argument, appellants also contend that CALJIC No. 3.00 allowed the same result with respect to the crime of attempted murder, as defined in CALJIC No. 8.66.

CALJIC No. 3.00, as used by the trial court, defined "principals," or the persons responsible for the commission of a crime: "Persons who are involved in committing a crime are referred to as principals in that crime. *Each principal, regardless of the extent or manner of participation is equally guilty.* Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." (Italics added.) Appellants contend that the italicized language above allowed the jury to convict them of first degree murder and attempted murder so long as Lorenzo had the requisite state of mind without a concurrent finding that they too acted with the requisite mental state. We reject these contentions for a number of reasons: (1) appellants forfeited these claims; (2) there was no error under the circumstances of this case; and (3) to the extent the instruction was erroneous given the particular facts of this case, any error was harmless.

### 1. McCoy, Samaniego, *and* Nero

In *McCoy, supra*, 25 Cal.4th at page 1122, the Supreme Court held that one who aids and abets a killing may be found guilty of a greater offense than the direct perpetrator. In *McCoy*, two defendants committed a driveby shooting where one person was killed. McCoy fired the fatal shot and his codefendant,

Lakey, was tried on a theory of aiding and abetting. At trial, McCoy testified that he fired the shots in fear of being shot first because he had driven past the location earlier that day and shots were fired at him. When he returned with Lakey, one of the persons he saw had what he believed to be a gun so he fired first in self-defense. (*Id.* at p. 1115.)

The jury convicted both defendants of first degree murder. The Court of Appeal reversed McCoy's conviction because the trial court misinstructed on the doctrine of imperfect self-defense, which would have reduced the murder conviction to voluntary manslaughter. (*McCoy, supra*, 25 Cal.4th at p. 1115.) The Court of Appeal also reversed Lakey's conviction, based in part on the fact that an aider and abettor cannot be convicted of an offense greater than that for which the actual perpetrator is convicted. (*Ibid.*)

The Supreme Court rejected the reasoning of the Court of Appeal with respect to its reversal of Lakey's conviction: "The statement that an aider and abettor may not be guilty of a greater offense than the direct perpetrator, although sometimes true in individual cases, is not universally correct. Aider and abettor liability is premised on the combined *acts* of all the principals, but on the aider and abettor's *own mens rea*. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*McCoy, supra*, 25 Cal.4th at p. 1120, italics added.)

In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164 [91 Cal.Rptr.3d 874] (*Samaniego*), the Court of Appeal extended *McCoy* to the benefit of the aider and abettor: ". . . [*McCoy*'s] reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state." In light of its decision, the court also observed that CALCRIM No. 400, the analogue to CALJIC No. 3.00, could be misleading insofar as it instructed that " '[a] person is *equally guilty* of the crime . . . whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation] . . . ." (*Samaniego, supra*, at p. 1165 [later finding, however, the issue forfeited and any error harmless].)

In *People v. Nero* (2010) 181 Cal.App.4th 504, 508–509 [104 Cal.Rptr.3d 616] (*Nero*), the defendants, who were brother and sister, were convicted of second degree murder in a stabbing death. The evidence, including a security video, showed the brother to be the perpetrator of the stabbing. The sister, who did not directly participate in the stabbing, was convicted as an aider and abettor, on the theory that she had handed her brother the knife. (*Id.* at pp. 508–510.) The brother testified at trial, claiming that he stabbed the victim in self-defense using a knife which the victim first used to stab him,

and further claiming that his sister did not encourage him in any way and in fact screamed at the two men to stop fighting. (*Id.* at pp. 508–509.) The jury was instructed on first and second degree murder, voluntary manslaughter, and aiding and abetting liability. (*Id.* at p. 510.)

Prior to returning verdicts, the jury expressly questioned the court about whether it could convict the aider and abettor of an offense less than that of the perpetrator. The trial court responded by rereading CALJIC No. 3.00, including the "equally guilty" language, and CALJIC No. 3.01. The jury convicted both defendants of second degree murder the next day. (*Nero, supra,* 181 Cal.App.4th at pp. 511–513.)

The Court of Appeal found the rereading of CALJIC No. 3.00, specifically the "equally guilty" language, to be error and reversed the sister's conviction. Relying on *McCoy* and *Samaniego,* the court concluded that the repeated language precluded the jury from examining the sister's state of mind separately from that of her brother and convicting her of a lesser offense while still convicting her brother of second degree murder. (*Nero, supra,* 181 Cal.App.4th at p. 518.)

What *McCoy, Samaniego,* and *Nero* stand for, then, is the unremarkable proposition that the extent of an aider and abettor's liability is dependent upon his particular mental state, which may, under the specific facts of any given case, be the same as, or greater or lesser than, that of the direct perpetrator. (See *Concha I, supra,* 47 Cal.4th at pp. 660, 665.) *Samaniego* and *Nero* take the matter a step further, however, by holding that pattern aiding and abetting instructions, to the extent they describe aiders and abettors and direct perpetrators as being "equally guilty," may be misleading under certain circumstances.

### 2. *Forfeiture*

 Notwithstanding its possible ambiguity in specific cases, as a general proposition and in most cases, CALJIC No. 3.00 is a correct statement of the law. (See *Samaniego, supra,* 172 Cal.App.4th at p. 1165 [referring to CALCRIM No. 400]; but see *Nero, supra,* 181 Cal.App.4th at p. 518 ["[w]e believe that even in unexceptional circumstances CALJIC No. 3.00 and CALCRIM No. 400 can be misleading"].) As such, appellants have forfeited their claim of error since they failed to request modification or clarification in the court below. (*Samaniego,* at p. 1163; see *People v. Lang, supra,* 49 Cal.3d at p. 1024.)

### 3. *No Error*

In any event, we find no error given the circumstances of this case.

The trial court in this case also instructed the jury with CALJIC No. 3.01: "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages, or instigates the commission of the crime." Thus, although the jury was told that an aider and abettor is "equally [as] guilty" as the direct perpetrator, it was also instructed that an aider and abettor must (1) *know* of the perpetrator's unlawful purpose, (2) *intend* to facilitate or assist that unlawful purpose, and (3) *act* in some manner that does assist or facilitate the unlawful purpose. In the circumstances of the immediate case, the trial court effectively told the jury that to find appellants guilty, each must have been *aware* of Lorenzo's unlawful purpose and, through act or advice, *intentionally* promoted the accomplishment of that purpose. This instruction advised the jury that it must base its decision of each appellant's liability not simply on the mental state of the direct perpetrator of the crime, but on that appellant's state of mind and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator.

Unlike *McCoy* and *Nero*, where the evidence suggested the principals might have differing states of mind and therefore might be guilty of different crimes, the evidence in this case did not: the evidence overwhelmingly showed that all four appellants, plus Lorenzo, went to the location to kill Pulido. Given the facts in this case, CALJIC No. 3.01 adequately clarified any ambiguity created by the "equally guilty" language of CALJIC No. 3.00. The charge as a whole, therefore, did not mislead the jury. (See *People v. Moore, supra*, 44 Cal.App.4th at pp. 1330–1331.)

### 4. *Harmless Error*

Even were we to find the instruction misleading under the facts of this case, which we do not, the error was harmless beyond a reasonable doubt. Given the strength of the evidence demonstrating that appellants and Lorenzo arrived at the apartment intending to kill Pulido, we find that if the instruction was error, beyond a reasonable doubt a rational jury's verdict would not have been different had the challenged language been omitted. (See *Concha II, supra*, 182 Cal.App.4th at pp. 1089–1090.)

### F. *CALJIC No. 3.02*

Appellants next argue that the trial court, by instructing the jury with CALJIC No. 3.02, allowed the jury to convict them of first degree murder by finding that they aided and abetted Lorenzo in his own death. This instruction, they contend, eliminated the prosecution's duty to prove that a surviving

accomplice committed an intentional provocative act that proximately caused Lorenzo's death, and allowed the jury to convict so long as Lorenzo himself committed a provocative act.

After defining aiders and abettors by reading CALJIC Nos. 3.00 and 3.01, the court then read a modified version of CALJIC No. 3.02, which stated, in pertinent, part as follows:

"One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.

"In order to find the defendant guilty of the crime of murder *under this theory*, you must be satisfied beyond a reasonable doubt that:

"1. The crime of attempted murder or attempted residential burglary was committed;

"2. That the defendant aided and abetted that crime;

"3. That a co-principal in that crime committed the crime of *attempted murder* or *attempted residential burglary*; and

"4. The crime of murder was a natural and probable consequence of the commission of the crime of attempted murder or attempted residential burglary." (Italics added.)

As discussed earlier, the trial court later defined the theory of provocative act murder by reading CALJIC No. 8.12 which provided, in pertinent part, as follows:

"A homicide committed during the commission of a crime by a person who is not a perpetrator of that crime, in response to an intentional provocative act by a perpetrator of the crime other than the deceased perpetrator, is considered in law to be an unlawful killing by the surviving perpetrators of the crime. [¶] . . . [¶]

"In order to prove this crime, each of the following elements must be proved:

"1. The crime of attempted murder or attempted residential burglary was committed;

"2. During the commission of the crime, a surviving perpetrator also committed an intentional provocative act;

"3. The victim of the attempted murder or attempted residential burglary in response to the provocative act, killed a perpetrator of the crime;

"4. The surviving perpetrator's commission of the intentional provocative act was a cause of the death of Jesus Lorenzo."

We agree that CALJIC No. 3.02 as read should not have been given, for two reasons. First, the instruction on its face was incorrectly modified: element No. 3 should have referred to the nontarget crime of murder, not the target crimes of attempted murder and attempted burglary. Second, as read to the jury, CALJIC No. 3.02 described itself as a *separate* theory of murder, implicitly in addition to the provocative act doctrine, which the court subsequently read. And, as a separate theory of liability, it was inapplicable to the facts of this case.

Appellants could be guilty of *attempted murder* and *attempted burglary* as aiders and abettors of Lorenzo in his act of scaling the apartment wall while armed with a handgun. As accomplices in the underlying crimes of attempted murder and attempted burglary, they could also be guilty of murder in connection with Lorenzo's death under the doctrine of provocative act murder, so long as at least one surviving accomplice committed a provocative act that proximately caused Lorenzo's death. They could not, however, be guilty of murder as aiders and abettors under a theory of natural and probable consequences: simply put, Lorenzo could not be guilty of his own murder so appellants could not aid and abet him in that "crime," nor could they "aid and abet" Pulido—a nonprincipal—in his justified use of lethal force against Lorenzo. (See *People v. Antick, supra*, 15 Cal.3d at p. 91.) Aiding and abetting along with natural and probable consequences as a theory of liability for the crime of *completed murder* was simply not available under the facts of this case. The instruction was not applicable and should not have been given.

Nevertheless, we find that the use of this instruction does not warrant reversal. First, jurors are presumed to follow the law as given to them by the trial court. (*People v. Sanchez, supra*, 26 Cal.4th at p. 852.) Second, the trial court also instructed the jury with CALJIC No. 17.31: "The purpose of the court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to the facts determined by you not to exist. Do not conclude that because an instruction has been given I am expressing an opinion as to the facts."

Considering these two principles, as well as the instructions given as a whole (*People v. Moore, supra*, 44 Cal.App.4th at pp. 1330–1331), we are convinced that the jury would have understood CALJIC No. 3.02 exactly as we have and determined, simply, that it did not apply. As discussed earlier, the trial court gave CALJIC No. 3.00, which instructed the jury that persons involved in the commission of a crime are called "principals" and that "principals" include those who actually commit the act that constitutes the crime and as well as those who aid and abet commission of the crime. The first sentence of CALJIC No. 3.02, as given, instructed the jury that aiders and abettors are guilty not only of the crimes originally contemplated (the target crimes) but also "of any other crime *committed by a principal* which is a natural and probable consequence " of those crimes. (Italics added.) In the immediate case, the act of killing was not committed by a *principal* involved in the commission of the target crimes of attempted murder and attempted burglary. Thus, there was no murder of which accomplices in the underlying target crimes could be guilty based on a theory of natural and probable consequences. CALJIC No. 3.02, by its express terms, therefore, was simply inapplicable and would have been rejected by the jury. The killing in this case was committed instead by the *victim* of the underlying target crimes and in response to those crimes. CALJIC No. 8.12, defining provocative act murder, by its express terms was thus the only theory of homicide available to the jury. We conclude therefore, that although CALJIC No. 3.02 should not have been given, any error was harmless beyond a reasonable doubt. (See *People v. Chun, supra*, 45 Cal.4th at p. 1203 [instructional error harmless where reviewing court can conclude that jury based its verdict on the legally valid theory and rejected the legally invalid theory].)[7]

### G. *CALJIC No. 5.44*

Appellants contend the trial court's use of CALJIC No. 5.44 created a "mandatory, irrebuttable presumption" that Pulido's firing of his shotgun was justified. This, appellants continue, violated due process because the prosecution thus did not have to prove all elements of the murder charge against them. We reject this contention.

---

[7] Appellants make a further argument with respect to CALJIC No. 3.02. They contend that to the extent giving it was not error, it should have been modified in two ways: first, the nontarget crime listed in element No. 4 should have been willful, deliberate, and premeditated first degree murder, not simply murder; and, second, a natural and probable consequence should have been defined as requiring a high probability, not merely being reasonably forseeable. Since we have already concluded that giving CALJIC No. 3.02 was error, although harmless, this additional contention is irrelevant. We decline to address it further except to say that adding the language requested by appellants would not have made CALJIC No. 3.02 any more applicable to the facts of this case.

## 1. *Background*

At trial, Hernandez, without objection from the other appellants, asked the trial court to give CALJIC No. 5.12 (justifiable homicide in defense of self or another) and CALJIC No. 5.14 (homicide in defense of another). Hernandez's trial counsel argued that the instructions were necessary "because this jury has to determine if and[,] if so[,] at what point[,] [Pulido] was acting in self-defense." Later discussions, as well as defense closing arguments, show that the defense used these instructions to argue two separate, but related, theories: (1) if the jury accepted Pulido's testimony, the only act that reasonably provoked him to fire was Lorenzo's attempted entry and therefore no surviving perpetrator or accomplice committed the requisite independent provocative act and (2) in any event, the jury should reject Pulido's testimony and conclude that he shot a drunken Lorenzo before he entered the room, executing him in cold blood rather than as a reasonable response to a legally sufficient provocative act.

The prosecutor argued to the court that self-defense instructions were not necessary since provocative act murder focuses on the conduct of the perpetrators and not the motive of the actual killer. He requested, however, that the court give CALJIC No. 5.42 (resisting an intruder upon one's property) and the aforementioned CALJIC No. 5.44 (presumption of fear of death by resident using lethal force) if the defense requested instructions were given. The court ultimately agreed to give the instructions requested by both sides. None of the appellants objected to the inclusion of CALJIC No. 5.44, and Hernandez specifically agreed to it, with one exception that will be noted below.

CALJIC No. 5.44 is based on section 198.5, added to the Penal Code as part of the Home Protection Bill of Rights. (*People v. Hardin* (2000) 85 Cal.App.4th 625, 633–634 [102 Cal.Rptr.2d 262].) Ordinarily, it is a defense instruction, given in cases where a resident is charged with a crime involving the use of deadly force against someone arguably believed to be an intruder. As drafted, CALJIC No. 5.44 reads as follows:

"If the evidence shows that:

"1. A [defendant] [perpetrator] used force intended or likely to cause death or great bodily injury, within his or her residence;

"2. The force was used against another person who was not a member of the [defendant's] [perpetrator's] family or household;

"3. The person against whom the force was used, unlawfully and forcibly, either was entering or had entered the residence; and

"4. The [defendant] [perpetrator] knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred; then:

"You must presume that [defendant] [perpetrator] at the time the force was used held a reasonable fear of imminent peril of death or great bodily injury to [himself] [herself] [or] [a member of [his] [her] family or household].

"This presumption means that you must find the [defendant] [perpetrator] held a reasonable fear of imminent peril of death or great bodily injury to (himself, etc.) unless you are satisfied beyond a reasonable doubt from all of the evidence that an unlawful [killing] [injury] occurred.

" 'Great bodily injury' means a significant or substantial physical injury."

With the express or implicit concurrence of all trial counsel, the next to last paragraph of the instruction—indicating that the presumption must be followed unless the evidence showed beyond a reasonable doubt that an unlawful killing occurred—was omitted when the instruction was given to the jury in this case. The court, however, overruled Hernandez's request to insert "beyond a reasonable doubt" after "If the evidence shows" in the first sentence of the instruction. As read to the jury, the court substituted "Mr. Pulido" for "defendant" or "perpetrator."

### 2. *Forfeiture*

In the court below, appellants voiced no objection to CALJIC No. 5.44, except to the extent Hernandez essentially asked for the deletion of the final paragraph to be offset with the insertion of the phrase "beyond a reasonable doubt" in the first sentence after "If the evidence shows." No appellant argued that it created an impermissible presumption.

 CALJIC No. 5.44 is a correct construction of section 198.5 regarding the presumption applicable to a resident's use of force. Appellants failed to make to the court below the objection they make now to this court. Additionally, for reasons which will be discussed below in connection with the merits of this claim, we find that appellants' substantial rights were not in any way affected by this instruction. Accordingly, the claim is forfeited on appeal. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465 [78 Cal.Rptr.3d 855].)

### 3. *No Self-defense Instructions Required*

 None of the self-defense instructions, whether given at the request of the defense or at the request of the prosecution in response to the defense request, were required. Provocative act murder is not dependent upon the

reasonableness of the actual killer's lethal response. The inquiry instead focuses simply on whether or not a surviving perpetrator committed a provocative act that *proximately caused* the killing. (*People v. Gardner, supra,* 37 Cal.App.4th at pp. 478–479; see *Pizano v. Superior Court, supra,* 21 Cal.3d at pp. 137–138; *Briscoe, supra,* 92 Cal.App.4th at pp. 592–593.) Liability for provocative act murder does *not* depend upon the reasonableness of the actual killer's use of force; it depends upon whether the killing was a natural and probable consequence of the perpetrator's provocative act. (*People v. Gardner, supra,* at p. 481; *Briscoe, supra,* at p. 593.) More succinctly, liability for a provocative act murder depends upon the conduct of the perpetrator, not upon the mental state of the crime victim. (*Briscoe,* at p. 593.)

Thus, none of the self-defense instructions should have been given in this case. They are simply not relevant in the general context of provocative act murder. Nevertheless, we find no reversible error, first because the majority of the instructions were requested by the defense and were thus invited error. (*People v. Williams* (2008) 43 Cal.4th 584, 629 [75 Cal.Rptr.3d 691, 181 P.3d 1035]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Second, we agree with the People: these instructions, as a general matter, benefitted appellants by giving each yet another avenue by which to argue that provocative act murder had not been proved.

To the extent that appellants specifically criticize CALJIC No. 5.44 as benefitting the People by its presumption, we disagree. The instruction, as worded, arguably created a presumption of reasonableness with respect to Pulido's shots insofar as they were in response to Lorenzo's attempted entry of the house. The trial court, however, also gave CALJIC No. 8.12 which, in no uncertain terms, informed the jury that to be sufficient, a provocative act that proximately caused Lorenzo's death must have been committed by a *surviving* accomplice. The court supplemented this instruction with CALJIC Nos. 3.40 and 3.41, which specifically defined proximate cause. Thus whether Pulido acted reasonably in shooting Lorenzo based on whether or not Lorenzo was entering or attempting to enter Pulido's home was entirely irrelevant to the jury's duty—as instructed—to determine whether or not another perpetrator committed a provocative act that proximately caused Lorenzo's death.

As mentioned above, the court instructed the jurors pursuant to CALJIC No. 17.31, which told them to disregard instructions not applicable to the facts as they found them. And, again, jurors are presumed to follow the instructions given to them by the court. (*People v. Sanchez, supra,* 26 Cal.4th at p. 852.) We conclude that any error related to CALJIC No. 5.44 was harmless beyond a reasonable doubt under any applicable standard: the jury, by following the requirements of CALJIC Nos. 3.40, 3.41, and 8.12 would

simply have disregarded CALJIC No. 5.44 as not relevant to the issues before it. (See *People v. Chun, supra,* 45 Cal.4th at p. 1203.) For the same reason, we conclude, in relation to our earlier forfeiture discussion, that the instruction did not affect the substantial rights of any appellant.

Based upon our reasoning above, we need not, and therefore do not, reach appellants' additional contention that the instruction created a "mandatory, irrebuttable presumption" that violated due process.

### H. *CALJIC No. 8.80.1*

Next, appellants Hernandez, Perez, and Caseros argue that CALJIC No. 8.80.1, as provided to the jury, was error because it omitted an element of the gang-murder special circumstance and also included superfluous language related to an irrelevant special circumstance. Although we agree the instruction as read was error, we find the error harmless.

#### 1. *Background*

The trial court gave the following version of CALJIC No. 8.80.1, the general requirements for special circumstance allegations:

"If you find a defendant in this case guilty of murder of the first degree, you must then determine if the following special circumstance is true or not true: intentional killing by an active street gang member.

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve grave risk of death to an innocent human being.

"You must decide separately as to each of the defendants the existence or nonexistence of each special circumstance alleged in this case. If you cannot agree as to all the defendants, but can agree as to one or more of them, you make your finding as to the one or more upon which you do agree.

"In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.

"You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied."

The trial court also gave CALJIC No. 8.81.22, which set forth the elements of the gang-murder special circumstance codified in section 190.2, subdivision (a)(22): (1) the defendant intentionally killed the victim; (2) the defendant was an active member in a criminal street gang; (3) the members of the gang engaged in a pattern of criminal gang activity; (4) the defendant was aware of that pattern of criminal gang activity; and (5) the murder was carried out to further the activities of the gang.

■ The People concede, and we agree, that CALJIC No. 8.80.1, as given, was problematic for two reasons. First, it includes the paragraph of the form instruction, paragraph 3 above, defining "reckless indifference to human life." This definition is applicable to aiders and abettors in felony-murder cases only, and therefore is not applicable to this case. Second, it omits entirely the paragraph designed to track section 190.2, subdivision (c), which *is* applicable to this case: "If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree."

Nevertheless, we conclude that the error was harmless. First, insofar as the instruction to the jury included the "reckless indifference" language, we find under any applicable standard that the error was harmless beyond a reasonable doubt. Although the instruction as read contained this surplus definition, it also omitted the portion of the instruction that told the jury what the definition was relevant to: a finding that a nonkiller aider and abettor acted with reckless indifference to human life and as a major participant in the commission of an underlying section 190.2, subdivision (a)(17) (felony murder) crime. As such, it was a definition without a purpose and we are convinced that any rational jury would have simply disregarded it. (See *Concha II, supra*, 182 Cal.App.4th at pp. 1089–1090.)

The omission of the requirement that a nonkiller must, with the intent to kill, aid and abet the actual killer is more problematic but nevertheless harmless beyond a reasonable doubt. Here, pursuant to CALJIC Nos. 3.40, 3.41, and 8.12, the trial court essentially instructed the jury that a surviving perpetrator in an underlying crime who commits an intentional provocative act that proximately causes death through a third party is guilty of murder. Based upon our earlier analysis (see Discussion, pt. B., *ante*), because the provocateur proximately causes the death, we conclude that he can be characterized as the killer of the victim despite the intervening conduct of the third party. And, to the extent he commits the provocative act with express

malice, he has intentionally killed the victim. Thus insofar as the jury found any of the appellants to have committed a legally sufficient provocative act, the aiding and abetting language of CALJIC No. 8.80.1 would have been superfluous.

More importantly, to the extent the jury found any of the appellants guilty based upon their status as accomplices to the provocateur in the underlying crimes, the omission nevertheless remains harmless. When the trial court fails to instruct on an element of the charge, the error is harmless so long as the record establishes the factual issues involved were resolved adversely to the defendant under other properly given instructions. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)

Here, that is precisely what occurred. The jury convicted all four appellants of attempted murder and attempted residential burglary. As discussed earlier in this opinion, attempted murder requires an intent to kill and, as charged in the immediate case, so did the crime of attempted burglary. The court instructed the jurors consistent with these requirements. Consistent with *People v. Beeman, supra*, 35 Cal.3d at page 561, the trial court also correctly instructed the jurors that to be guilty as an aider and abettor, a defendant must (1) have knowledge of the direct perpetrator's unlawful purpose, (2) intend to encourage or facilitate commission of that crime, and (3) by act or advice actually aid or facilitate that crime.

Thus, to the extent the jury found appellants or any of them to be direct perpetrators of attempted murder or attempted burglary, the jury necessarily found an intent to kill. To the extent the jury found any of them to be aiders and abettors of the direct perpetrator or perpetrators, it found that they were aware of the perpetrator's intent to kill, intended to facilitate the desired killing, and by conduct did facilitate that purpose. While technically this state of mind is distinct from an actual intent to kill, we conclude that it necessarily includes such an intent: one who knows another wants to kill, intends to facilitate that killing, and by action does so facilitate, necessarily intends to kill as well. Based upon these instructions, then, the jury necessarily concluded that any appellant who did not himself proximately cause Lorenzo's death through a provocative act nevertheless aided and abetted the provocateur in the commission of the underlying crime with the intent to kill. Accordingly, the jury necessarily found the elements required for the special circumstance. Any error was therefore harmless beyond a reasonable doubt.[8] (*People v. Guiton, supra*, 4 Cal.4th at pp. 1129–1130.)

---

[8] In the context of this challenge to the special circumstance, appellants also contend that the "equally guilty" language of CALJIC No. 3.00 compounded the error because it allowed the jury to find an appellant guilty upon a finding that any single appellant (or Lorenzo) harbored an intent to kill. For the reasons stated earlier (see Discussion, pt. E., *ante*), we reject this contention. Appellants also contend that the prosecutor compounded the error of the instruction

### I. *Ineffective Assistance of Counsel*

Mejia alone contends that his trial counsel was ineffective for failing to request CALJIC No. 4.21, which specifically directs jurors to consider evidence of intoxication on the issue of whether a defendant formed any requisite specific intent. Mejia points out that the willful, deliberate, and premeditated enhancement for attempted murder may be imposed vicariously: if the direct perpetrator harbors such a state of mind, an accomplice may be vicariously liable for the enhancement so long as he has the intent to kill. (See *Concha I, supra*, 47 Cal.4th at p. 665.) Thus, Mejia contends, the jury should have been told to consider the effect of alcohol on Lorenzo's premeditation and deliberation since, to the extent it prevented Lorenzo from reaching that state of mind, it may have also absolved Mejia of liability for the enhancement. We reject this contention as meritless.

Ineffective assistance of counsel occurs when (1) counsel fails to act in a manner expected of reasonably competent counsel *and* (2) it is reasonably probable that a more favorable outcome would have occurred absent the deficient performance. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674, 104 S.Ct. 2052].) When expedient, such a claim may be decided based on the materiality prong alone. (See *id.* at p. 697.)

We choose to follow that "expedient" path in the immediate case. Whether or not the omission of Mejia's trial counsel was negligent, which we do not decide, a review of the record shows that it was in no way material. The evidence discussed earlier in this opinion shows that all appellants, as well as Lorenzo, arrived at the location with the intent to kill Pulido. With specific reference to Mejia, the evidence further shows that he was a direct perpetrator of the attempted planned killing: he and Lorenzo scaled the wall to Pulido's bedroom and he and Lorenzo armed themselves with loaded guns. On the record before us, Lorenzo's state of mind was essentially irrelevant to the issue of Mejia's guilt for the attempted murder and the accompanying enhancement. The omission of his trial counsel, if any, was not material.

### J. *Two Definitions of Malice*

The trial court gave two instructions on the nominally similar concepts of "malice" or "maliciously" and "malice aforethought." First, the court gave

when he discussed the doctrine of transferred intent which, they contend, is not applicable to the circumstances of this case. Appellants did not object below to the prosecutor's extremely brief reference to the doctrine of transferred intent and that issue is therefore forfeited or waived. (*People v. Stitely* (2005) 35 Cal.4th 514, 557 [26 Cal.Rptr.3d 1, 108 P.3d 182].) Even if this claim is not waived, the error, if any, was clearly harmless under *Guiton*: as discussed above, the jury necessarily decided the factual issues involved adversely to all appellants under other, properly given instructions.

CALJIC No. 1.22 which defines "malice" and "maliciously" as an intent to "vex, annoy, or injure another person or an intent to do a wrongful act." This definition of malice pertained to the shooting at an inhabited dwelling charge, which requires that the shooting be "malicious." (§ 246.) Additionally, the court gave CALJIC No. 8.11, which sets forth the standard definitions of implied and express malice aforethought required for murder. Appellants contend that because the trial court did not expressly tell the jury to limit use of CALJIC No. 1.22 to the shooting at an inhabited dwelling charge, the jury may have applied that definition of malice to the murder charge and convicted them without finding the requisite malice aforethought. We reject this claim.

■ First, appellants have forfeited this claim: CALJIC No. 1.22 is a correct definition of malice for purposes of section 246, and appellants did not request a clarifying modification. (See *People v. Lang, supra,* 49 Cal.3d at p. 1024.) We see no reason to depart from the general rule of forfeiture on this issue: contrary to appellants' assertions, this issue is not "misinstruction," which may be reviewed absent an objection, but an arguably ambiguous though otherwise correct instruction for which no appellant requested clarification. Additionally, for the reasons stated below in connection with our analysis of this claim on the merits, we do not find that this claimed "error" in any way affected appellants' substantial rights, another basis for ignoring the general rule regarding forfeiture. (*People v. Mitchell, supra,* 164 Cal.App.4th at p. 465.)

Reaching the issue, we find, as well, no possibility that the jurors would have confused the malice aforethought required for murder with the malice or malicious conduct required for the section 246 violation. Utilizing CALJIC No. 1.01, the court instructed the jury to consider the instructions as a whole. Jurors are presumed to follow the instructions given to them. (*People v. Sanchez, supra,* 26 Cal.4th at p. 852.) The definitions of express and implied malice aforethought immediately followed the definition of murder and thus clearly applied to that charge. In addition, implied malice was defined a second time during the reading of the murder instructions when the court read CALJIC No. 8.31, and express malice was defined a second time in the context of *attempted* murder when the court read CALJIC No. 8.66. And, finally, CALJIC No. 1.22 defined not only "malice" but also "maliciously," a word not used anywhere in the murder instructions but expressly used in CALJIC No. 9.03, which the court used to set forth the elements of shooting at an inhabited dwelling. In this context, there is simply no possibility that the jury mistook CALJIC No. 1.22 as being applicable to the charge of murder.

K. *Fines and Assessments*

All appellants contend that the fines imposed pursuant to Government Code section 70373 were incorrectly set in the total amount of $160 rather than $120. Appellants Perez, Caseros, and Hernandez contend that the court improperly imposed $5,000 parole revocation fines on them pursuant to Penal Code section 1202.45 because their sentences render them legally ineligible for parole. Finally, all appellants contend that the court improperly imposed the $32 DNA penalty assessment because they committed their crimes prior to enactment of enabling statute for that assessment, Government Code section 76104.7, subdivision (a).

The People concede that these positions are correct and we agree. Consistent with the discussion above, the various fines referenced are either reduced or stricken.

## DISPOSITION

The various statutory fines imposed by the trial court which are discussed above are reduced or stricken consistent with this opinion. In all other respects, the judgments are affirmed.

Bigelow, P. J., and Grimes, J., concurred.

Appellants' petitions for review by the Supreme Court were denied March 20, 2013, S207628. Kennard, J., was of the opinion that the petitions should be granted.