Filed 4/21/21  P. v. Hernandez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B301861 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA089685) |
| v. | |
| OSCAR HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed, as modified, with instructions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant Oscar Hernandez guilty of first degree murder (Pen. Code, § 187, subd. (a) [count 1])[1] and second degree murder of a human fetus (§ 187, subd. (a) [count 2]).  With respect to both counts, the jury found true the allegations that Hernandez discharged a firearm, causing great bodily injury and death. (§ 12022.53, subd. (d).)  As to count 1, the jury found true the allegation that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), and the special circumstances that Hernandez committed multiple murders (§ 190.2, subd. (a)(3)) and committed the murder in count 1 while he was an active gang member to further the activities of the gang (§ 190.2, subd. (a)(22)).[2]

At the sentencing hearing, Hernandez admitted to having served four prior prison terms, two of which he served concurrently.  The trial court sentenced Hernandez to

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury found not true the allegation in count 1 that the victim was killed because she was a witness to a crime (§ 190.2, subd. (a)(10)), and also found not true the allegation that the murder of the fetus was committed to benefit a criminal street gang in count 2 (§ 186.22, subd. (b)(1)(C)).

life without parole in count 1, and a consecutive 15 years to life in count 2, plus 25 years to life for the firearm use enhancement. The court imposed three 1-year terms for the prior prison term enhancements.

On appeal, Hernandez contends that (1) he was deprived of his constitutional right to due process because the jury was not instructed regarding third party liability; (2) there was insufficient evidence to support the gang enhancement and gang special circumstance; (3) his conviction under an implied malice murder theory of liability for murdering a fetus violates the Eighth Amendment; and (4) the three 1-year prior prison term enhancements must be stricken pursuant to amendments effected by Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136). The People agree that the prior prison term enhancements must be stricken, but challenge Hernandez's other contentions.

We order the three section 667.5, subdivision (b) prior prison term enhancements stricken, but otherwise affirm the judgment.

## FACTS[3]

In July of 2011, the victim, who was a frequent methamphetamine user, lived in the "blue house"[4] with

---

[3] The facts are recounted as presented by the prosecution. Hernandez did not proffer evidence in his defense.

approximately eight other methamphetamine users, in territory claimed by the Humphrey Boys criminal street gang. She was 18 weeks pregnant when she was killed. The blue house was a hub of Humphrey Boys activity, and was located across from Humphrey Park, which was claimed by the gang as well. The victim was murdered in a vacant house two houses away from the blue house, also in Humphrey Boys territory. The victim was killed by a single, close-range gunshot to the head at approximately 11:00 in the morning on July 13, 2011. The fetus died as a result of her death. On the same day, at approximately 4:00 p.m., while the anti-gang Summer Night Lights event was occurring in Humphrey Park, the vacant house in which the victim was killed was set on fire, and the victim's body was burned beyond recognition.

The Summer Night Lights event was intended to be a "gang intervention," where gang members could come out of "gang dress" and interact positively with the community and police. Summer Night Lights was also aimed at keeping kids out of gangs. People from the community would come to the park with their children to eat and play games. Summer Night Lights took place between 4:00 p.m. and 11:00 p.m. every Wednesday through Saturday evening in June and July. The event required a heightened police presence, and police ensured that gang members did not enter Humphrey Park while dressed in gang clothing. Police officers

<hr>

[4] The house was referred to the blue house throughout trial because it was painted blue at the time of the murder.

monitoring Summer Night Lights left the event to respond to the murder and fire.

At the time of the murder, Hernandez was a "soldier" for the Humphrey Boys, which meant that he was just below "shot-callers" in the gang hierarchy. Soldiers were responsible for carrying out the shot-callers' orders. Soldiers' duties included committing crimes and deciding who was allowed to remain in Humphrey Boys territory and who was not. If a soldier ordered someone to leave and they did not, there would be repercussions. Hernandez patrolled the Humphrey Boys' territory to "[s]ee what's crackin' in every house" for the gang. He was at the blue house every day "do[ing] [his] little rounds."

Humphrey Boys members rise up the ranks in the gang by committing crimes of escalating seriousness. Members who were willing to threaten and kill had higher gang status than those who committed lesser crimes such as "tagging" the area with graffiti. Respect was everything within the gang, and respect was gained by instilling fear in the community. Lighting the house that contained the victim's body on fire while Summer Night Lights was occurring across the street would send a strong message to the community that the police were unable to protect them from the Humphrey Boys. When members of the community were frightened, the gang could operate with impunity, because people were unlikely to report crimes or testify as witnesses.

The Humphrey Boys also punished "snitching"—reporting crimes, testifying, or simply talking to police

officers—with death.  In February of 2011, the victim had reported a crime to the police, and someone was arrested as a result.[5]

The Humphrey Boys would tolerate a member of another gang living in their territory, as long as the individual did not publicly promote his own gang.  A member of another gang could sell drugs in Humphrey Boys territory if they sought and obtained permission first.  In such a situation, the revenue from the drug sales would be considered part of the Humphrey Boys' revenue.  Drug dealers had to negotiate the type of drug they would sell and estimate their profits.  They were required to pay a percentage of sales or "taxes" based on that estimate.  In return, they received protection from the Humphrey Boys.  A dealer who failed to pay taxes to the gang would face retribution, which could include death.  The Humphrey Boys paid part of their drug revenue to the Mexican Mafia, which monitors Hispanic gangs.  If the Humphrey Boys failed to pay, the Mexican Mafia would place an unconditional "green light" or "hit to kill" on the gang.

When a buyer failed to pay a drug dealer, the Humphrey Boys would discipline the buyer as part of their protection agreement with the dealer.  If a drug dealer wanted to kill someone, the dealer had to seek permission, or face being killed by the gang themselves.  Ultimately, the

---

[5] The parties stipulated that Hernandez was not the person who was arrested as a result of the victim's police report.

6

Humphrey Boys would commit the murder if they deemed it necessary. The Humphrey Boys preferred to "handle their business on their own. They would not have somebody from another gang murder somebody in their own territory. That could start chaos [and lead to a gang war]."

Until approximately four days before the murder, R.E. and his family lived in the house where the victim was killed, which was in Humphrey Boys territory, two houses away from the blue house. R.E. was a Pacoima Crazy Boys gang member. He sold crystal methamphetamine from his family's home. R.E. knew Hernandez and was aware that Hernandez was frequently at the blue house. After R.E.'s family moved out, he continued to return to the house, which was vacant.[6]

On the morning of the murder, R.E. returned to the vacant house to get the mail. Hernandez approached him and asked where the methamphetamine was. R.E. offered to smoke methamphetamine with Hernandez, and Hernandez accepted. As they were starting to go inside, Hernandez told R.E. to hold on because he was going to get someone. Hernandez ran toward the blue house and R.E. went into the vacant house. Hernandez returned with the victim a few minutes later. R.E. was familiar with the victim because he

---

[6] R.E. testified that he sold drugs to J.G., who lived in a house next door to the blue house, and to M.D., who lived in the blue house, but denied that he sold drugs to anyone else who lived in the blue house. R.E. claimed that he never asked for the Humphrey Boys' permission to sell drugs.

had seen her at the blue house.  All three of them went into the vacant house and smoked methamphetamine together.

After they had passed a pipe around a few times, R.E. said he needed to go.  Hernandez asked if he could get a ride, and R.E. said yes, but that he was in a hurry.  R.E. walked outside to wait while Hernandez and the victim finished smoking.  R.E. noticed three people standing outside the blue house looking in his direction.  R.E. started walking toward his car.  He heard a single gunshot.  Hernandez ran out of the house and got into R.E.'s car.

When he entered the car, Hernandez was holding something in his pocket that R.E. believed to be a gun.  As they were driving away, R.E. asked what the noise was and where the victim had gone.  Hernandez said he shot her, but did not explain why.  He just said, "Fuck that bitch."  R.E. dropped Hernandez off on the other side of Humphrey Park. Hernandez warned R.E. not to return to the vacant house. R.E. never went back to the house and never saw Hernandez again.

M.D. and M.R. lived in the blue house with the victim. Sometime in the week before the murder, M.D., who was also a Humphrey Boys gang member, argued with Hernandez over a gun.[7]  M.D. took the gun away from

---

[7] The gun was marked at trial as People's Exhibit 3, and a photograph of the gun was marked as People's Exhibit 59.  M.D. identified both exhibits as the gun about which he argued with Hernandez.

Hernandez because he was young and had a temper, but Hernandez took it back.

A few nights before the murder, M.D. and M.R. bought drugs from R.E. at his house. R.E. was angry at the victim, and told M.D. "that bitch owed him money." He also called the victim a whore and said that he did not like her. R.E. told them the victim had been selling drugs for him.

The night before the murder, the victim told M.R. that she owed R.E. around $400, and that she planned to repay him.

C.H. came to the blue house to smoke methamphetamine the night before the murder, and stayed there overnight. A man came to the blue house that night, "talked shit" to the victim, and called her a bitch. C.H. made the man stop speaking to the victim that way because it was disrespectful.

S.C. lived in the blue house. The night before the murder, S.C. saw Hernandez talking with a shot-caller for the Humphrey Boys, known by the moniker "Spanky" or "Spanks," who also worked for Mexican Mafia affiliates. As Spanky was leaving, he told the victim goodbye and then laughed. S.C. thought it was strange that the shot-caller spoke to the victim because he was supposedly angry with her for snitching. The victim had also stolen a lot of "profiles" (personal information used to commit fraud) from the shot-caller. Later that night, S.C. saw Hernandez

walking around the blue house with a gun. She had seen Hernandez with the same gun two days earlier.[8]

When M.R. woke up on the morning of the murder, Hernandez and F., one of Hernandez's two girlfriends, were in the victim's room. Hernandez asked the victim for cigarettes for R.E. The victim asked Hernandez to walk with her to take R.E. the cigarettes and the money she owed him.

C.H. also saw a male asking the victim for cigarettes that morning, and recognized him as the same person who called the victim a bitch the night before.

M.R. wanted to go with Hernandez and the victim to give R.E. the cigarettes, but M.D. and C.H. persuaded her to go to the liquor store with them instead. The victim looked nervous as she was leaving with Hernandez. M.R. last saw the victim and Hernandez walking in the direction of the vacant house. R.E.'s car was in the driveway, and R.E. was standing in the doorway of the vacant house. When M.R. returned, she saw Hernandez out in front of the blue house. She looked for the victim inside the blue house, but she could not find her.

Later that afternoon, M.R. learned there was a fire at the vacant house. Hernandez was at the blue house and she asked him what happened, but he said he did not know. Hernandez was walking around the house carrying F.'s backpack. He looked paranoid and scared, and seemed anxious to get out of the house. He left soon thereafter.

[8] S.C. identified the gun as the one depicted in People's Exhibit 59.

M.R. had seen R.E.'s car parked in the driveway of the abandoned house and on the street by the abandoned house that day. After the fire started, R.E.'s car was gone.

J.G. lived in the house next to the blue house. When J.G. and his mother, R.G., realized the vacant house was on fire, they went outside. J.G. saw Hernandez. J.G. re-entered his house, and Hernandez followed him. Hernandez told J.G. he needed money. Hernandez was carrying a bag "like old ladies used to wear," and was acting paranoid, as if something had just happened. J.G. told him to leave because his brothers and sisters were at home. Right after Hernandez left, J.G. heard a gunshot. He did not see anything, but he thought Hernandez had shot a gun.

At some point that afternoon, R.E. called M.D. and asked him what was wrong with Hernandez. R.E. said Hernandez had pulled out a gun and started shooting.

S.C. learned the victim was dead when C.H. showed her a video of the victim being taken to the vacant house. C.H. laughed and said, "That's [the victim] that they've taken out." S.C. had seen Hernandez at the blue house that morning. Hernandez was angry and yelling at F. He had returned to the blue house to get F. after the fire, and had the gun with him when he came back to the house.

S.E. was Hernandez's other girlfriend. She was in Humphrey Park with a friend for Summer Night Lights on the evening of the murder. Hernandez met them and tried to hand something to S.E. The object had a wooden handle

11

and a steel trigger and looked like a homemade gun.[9]  S.E. pushed the object away and refused to take it.  Hernandez was annoyed that S.E. would not take it from him.  He threw a rock at S.E. and walked away.

R.C. and her mother lived behind the blue house in a separate unit.  When R.C. was leaving her house that morning, she saw Hernandez, R.E., and the victim together.  When R.C. returned at about 8:30 p.m., her neighbor R.G. said she had also seen Hernandez, R.E., and the victim together that morning.  R.G. said she saw all three of them go into the vacant house, but that only Hernandez and R.E. came out at around 4:00 p.m., minutes before the fire started.  R.G. appeared nervous and scared.

Hernandez was detained the night of the murder near the park, and at that time was in possession of a .380 caliber handgun.  A person who lived across the street from the location where Hernandez was detained advised detectives that there was a gun lying in his front yard.  Officers recovered the gun, which was a Ruger .22 rifle that had the barrel and stock cut off so that it was the size of a pistol.[10]  Hernandez was arrested in connection with the murder, but released at some point, and the case went cold.  The case was

---

[9] In her testimony, S.E. identified the wooden handle of the gun from the photograph of the gun marked as People's Exhibit 59.

[10] The gun found in the yard was marked at trial as People's Exhibit 3.

revived several years later, and he was arrested again. Hernandez was held in a cell with a confidential informant. Their conversation was recorded, and excerpts of the conversation were played for the jury. Hernandez neither expressly denied nor admitted that he was the shooter in his conversation with the informant. Hernandez told the informant he was a Humphrey Boys gang member, and that he regularly patrolled the blue house. He was worried because the victim had been pregnant when she was killed. The informant asked if the victim was doing some "foul shit." Hernandez responded that he had heard that the victim "was running around with cops and all that shit." He knew that she was working with the police because "[i]n the hood, I've seen her roaming around." The informant said that snitching was a legitimate reason to kill a woman even if she was pregnant. Hernandez did not disagree. When the informant asked if the police were "gonna have a strap on [him],"[11] Hernandez said "Last time they showed me the strap, foo'."

J.G. was in prison around the time of Hernandez's second arrest. While incarcerated, he made a phone call that was recorded and played for the jury, in which he told a female that he thought he "fucked up" and snitched because he had told the police he saw the gun during a recorded interview in 2011. J.G. said that other people, including S.C. and M.R., also had talked to the police. J.G. told the female

---

[11] A "strap" is a gun that someone is carrying.

that C.H. was also in prison and that C.H. thought he "fucked up," too.

The bullet recovered from the victim's head was too damaged from impact for ballistic analysis; however, the weight and design of the bullet was consistent with being .22 caliber ammunition. The gun recovered from the front yard across from the place of Hernandez's arrest is a .22 caliber gun with a wooden handle. Two expended shell casings were recovered from the murder scene, including one near the victim's head; forensic analysis showed the casings were fired from the recovered .22 caliber gun.[12]

## DISCUSSION

### *Third Party Culpability Instruction*

Hernandez contends that he was deprived of his constitutional right to due process because the jury was not instructed regarding third party liability. He first argues that, although a third party liability instruction is a pinpoint instruction that the trial court normally has no obligation to give, we should consider requiring the trial court to give such an instruction sua sponte in cases like his where the person alleged by the defense to be the actual killer is a witness at trial (i.e., R.E.) and the court has determined that there is sufficient evidence for the defense to argue such a theory to the jury. Alternatively, he argues that counsel was

---

[12] The gun is depicted in People's Exhibit 59.

ineffective for failing to request the instruction.  We reject both arguments.

## **Legal Principles**

"'A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. . . .  [Citation.]  A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court."  [Citation.] . . . [A] trial court [also] has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions "as to defenses "'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'"  [Citation.]'  [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824 (*Gutierrez*).) "But "'when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties.  While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request.'" (*People v.*

*Saille* (1991) 54 Cal.3d 1103, 1117.)" (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.)

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).) A defendant is prejudiced by counsel's representation if there is a reasonable probability that the outcome would have been more favorable to the defendant but for counsel's failings. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

### Analysis

Our Supreme Court has spoken on the issue of whether the trial court has a duty to instruct where there is sufficient evidence of third party culpability. Instructions regarding third party culpability "'relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' [Citations.]" (*Gutierrez, supra*, 45 Cal.4th at p. 824.) Here, defense counsel did not request an instruction on third party culpability. The trial court therefore did not err by not giving the instruction in the absence of a request by the defense.

16

Defense counsel's failure to request the instruction did not prejudice Hernandez. Hernandez's defense at trial was that R.E. killed the victim, without Hernandez's aid or knowledge, and then attempted to shift the blame to Hernandez by calling M.D. and telling him that Hernandez had just pulled out a gun and started shooting. In closing statements, defense counsel argued that the jury should not find Hernandez guilty because the evidence supporting the prosecution's theory of the case was insufficient to establish Hernandez had either killed the victim or aided and abetted R.E. in killing the victim beyond a reasonable doubt. In light of defense counsel's repeated use of the reasonable doubt standard to further Hernandez's third party liability theory of defense, there is not a reasonable probability that Hernandez would have achieved a more favorable result if a third-party culpability instruction had been given. Because he cannot demonstrate prejudice, Hernandez's ineffective assistance of counsel claim necessarily fails, as does his related due process claim. (See *Anderson*, *supra*, 25 Cal.4th at p. 569.)

### *Sufficiency of the Evidence Supporting Gang Enhancement and Special Circumstance*

With respect to the murder in count 1, the jury found true the allegation that Hernandez had committed the crime for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote,

17

further, or assist in criminal conduct by gang members
(§ 186.22, subd. (b)(1)(C)), and the special circumstance that
he killed the victim when he was an active member of a
criminal street gang in order to further the criminal
activities of the gang (§ 190.2, subd. (a)(22)). Hernandez
contends that neither gang finding was supported by
sufficient evidence in the record. We disagree.

## Legal Principles

When reviewing for sufficiency of the evidence, we
consider "'"[t]he whole record in the light most favorable to
the judgment below to determine whether it discloses
substantial evidence—that is, evidence which is reasonable,
credible, and of solid value—such that a reasonable trier of
fact could find the defendant guilty beyond a reasonable
doubt."'" [Citation.]" (*People v. Casares* (2016) 62 Cal.4th
808, 823 (*Casares*), disapproved of on another ground in
*People v. Dalton* (2019) 7 Cal.5th 166, 214; see also *People v.
Clark* (2011) 52 Cal.4th 856, 942–943; *Jackson v. Virginia*
(1979) 443 U.S. 307, 321 [federal due process requires proof
"sufficient to have led a rational trier of fact to find guilt
beyond a reasonable doubt"].) "'The standard of appellate
review is the same in cases in which the People rely
primarily on circumstantial evidence.' (*People v. Bean* (1988)
46 Cal.3d 919, 932.) '. . . [I]t is the jury rather than the
reviewing court that weighs the evidence, resolves
conflicting inferences and determines whether the People

18

have established guilt beyond a reasonable doubt.' (*People v. Yeoman* (2003) 31 Cal.4th 93, 128.)" (*Casares*, *supra*, at p. 823.)

"Section 186.22 adds various sentencing enhancements for gang-related felonies.  For purposes of the enhancements, subdivision (b)(1) of that section requires that the felony be committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'  This portion of section 186.22 requires proof of only two elements:  (1) that the defendant committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members.  (*People v. Albillar* (2010) 51 Cal.4th 47, 67 [(*Albillar*)].)  It does not require proof that a defendant acted with the specific intent to promote, further, or assist a gang.  (*Ibid.*)" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613 (*Mejia*).)

Section 190.2, subdivision (a)(22) increases the penalty for first degree murder to life without parole or death if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  "Section 190.2, subdivision (a)(22), by its express terms contains three basic elements:  (1) the defendant must intentionally kill the victim; (2) while an

active participant in a criminal street gang; (3) in order to further the activities of the gang." (*Mejia, supra*, 211 Cal.App.4th at p. 612.)

"'In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs.' (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048 [].) "'Expert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support [a] gang enhancement.' (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; see *Albillar, supra*, 51 Cal.4th at p. 63.) While an expert may render an opinion assuming the truth of facts set forth in a hypothetical question, the 'hypothetical question must be rooted in facts shown by the evidence.' (*People v. Gardeley* [(1996)] 14 Cal.4th [605,] 618.) Indeed, an 'expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors."' (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.)" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 948–949.) "As for the specific intent prong, "'[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."' [Citation.]" (*Id.* at p. 949.) "[A]lthough all gangs regularly commit certain crimes, the fact that an individual gang member commits one of those crimes by himself is not substantial evidence that he did so for the benefit of, at the direction of, or in association with the gang." (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, fn. 7.)

**<u>Analysis</u>**[13]

Hernandez's arguments fall into two categories: arguments regarding the credibility of witnesses and the weight to be afforded evidence, and arguments attacking the prosecution's expert witness testimony as based on speculation and conjecture. With respect to the first category of argument, it is the role of the jury to weigh evidence and determine credibility. (*Casares*, *supra*, 62 Cal.4th at p. 823.) We defer to the jury's findings, which are supported by substantial evidence. It is immaterial that the jury could have made a different finding. The second category of argument is not supported by the record. The expert witnesses in this case had both general professional knowledge of gangs, including the Humphrey Boys, and personal knowledge of the Humphrey Boys and Hernandez himself. Officer Katherine O'Brien's opinion that, in a hypothetical case mirroring the facts of the instant one, the defendant would act with the requisite intent, was based not on conjecture, but on facts established by the evidence.

Substantial evidence demonstrated that Hernandez was an active, high-level member of the Humphrey Boys. Officer O'Brien testified regarding her personal knowledge of the Humphrey Boys, and Hernandez in particular. Officer O'Brien had been a peace officer with the Los Angeles Police Department for 12 years at the time of trial, and was

---

[13] Hernandez does not argue that the evidence was insufficient to establish that the killing was intentional.

assigned to patrol the Humphreys Boys' territory from 2010 to 2015.  When she was promoted from gang duty in 2015, she continued to patrol the same areas she had as a gang officer.  Officer O'Brien's work on patrol involved daily contact with, and interviews of, gang members.  She got to know individual members of the Humphrey Boys well.  Officer O'Brien had known Hernandez personally since 2010.  She was familiar with Hernandez's numerous gang tattoos, which demonstrated his allegiance to the Humphrey Boys.  The officer observed that Hernandez had new Humphrey Boys tattoos when she photographed him in 2017.  Officer O'Brien knew that Hernandez was a "soldier" in the Humphrey Boys—i.e., that he had "put in some work" or committed crimes.  She testified that "soldier" is not a low-level position within the gang.

Detective Mario Santana testified regarding the activities of soldiers in the Humphrey Boys.  Detective Santana worked for 19 years investigating homicides for the Los Angeles Police Department.  The detective had personal knowledge of the manner in which the gang handled non-gang drug sales within its territory because he had negotiated a drug deal undercover as a non-gang member.  His testimony regarding how R.E.'s drug sales would have been handled was based on that experience and other interactions with the gang.  Detective Santana estimated that over half of the homicides he investigated were gang-related.  He had contact with and interviewed Humphrey Boys gang members in connection with his homicide cases.

In 2011, Detective Santana was assigned to Foothill Homicide, and investigated the instant case. The detective testified that a soldier is "high[] level" within the gang. Shot callers are responsible for the actions of the gang. They order shootings, beatings, and other criminal activity. Soldiers are one step below shot callers. "A soldier works out there, and if a shot-caller directs him to go do something, to do it. So if you need something done and you need something done without hesitation, then you send a soldier to go out and do it."

There was also substantial evidence that Hernandez murdered the victim for the benefit of, at the direction of, or in association with the Humphrey Boys. S.C. testified that she saw Hernandez speaking with a shot-caller for the Humphrey Boys the night before the murder. The shot-caller paid particular attention to the victim as he was leaving, telling her goodbye and laughing. S.C. thought it was strange that the shot caller spoke to the victim because he was supposedly angry with her for snitching. The victim had also stolen profiles from the shot-caller. S.C.'s testimony that the victim had snitched was consistent with Hernandez's own statements about the victim. Hernandez told a confidential informant that the victim had done some "foul shit" because she had snitched, and also said that he had personally seen her talking with police officers. The jury could reasonably infer that, the night before the murder, the shot caller instructed Hernandez to kill the victim, either because she had snitched, which multiple

23

witnesses testified was an offense that carried the penalty of death, or because she had stolen profiles from him, which was unlikely to be tolerated, as allowing the victim to steal from a shot caller without reprisal would injure the gang's reputation.

The jury could also have found that Hernandez killed the victim because she owed R.E. money for drugs, and as R.E.'s paid protector, the Humphrey Boys were responsible for disciplining anyone who disrupted R.E.'s drug business. Detective Santana testified that a soldier in the Humphrey Boys would handle any problems R.E. had, including killing someone if necessary, in the normal course of business. The detective had personal knowledge of the manner in which the gang handled non-gang drug sales within its territory because he had negotiated a drug deal undercover as a non-gang member. His testimony was based on that experience and other interactions with the gang. Several witnesses testified that R.E. was very angry with the victim because she owed him money, cursing at her on two separate occasions. R.E. dealt drugs within Humphrey Boys territory, and although he denied that he had permission to do so, it was the gang's practice to require that he obtain permission and to tax him.[14] It was also Humphrey Boys policy for gang members to carry out any killings within its territory in order to maintain the appearance of control. The Humphrey

_____

[14] The jury could credit all or part of R.E.'s testimony and could consider evidence of the Humphrey Boys' regular practices when making its findings.

24

Boys had a strong incentive to prevent buyers from taking drugs from R.E. without paying. The money was not simply owed to R.E. Proceeds also went to the Mexican Mafia. If R.E. failed to pay the Humphrey Boys the money owed to them because the victim failed to pay him, the gang would lose revenue, and if the Humphrey Boys failed to pay the Mexican Mafia, members of the gang could be killed. Allowing a delinquent buyer to go undisciplined could send a signal to others that the gang would allow them to be late with payments, and compound the problem. Failing to discipline the victim could give the gang the appearance of softness, which would negatively affect its reputation, and its ability to continue its criminal enterprises as easily. From the evidence presented, the jurors could reasonably infer that R.E. asked the Humphrey Boys to kill the victim because she failed to pay him, the shot caller ordered the hit, and Hernandez carried out the shooting.

There was substantial evidence that the shot caller and the Humphrey Boys had multiple reasons to kill the victim. Any one reason—failure to make payment on drugs, snitching, or stealing—could be grounds for murder, and killing the victim for one of those reasons would further the criminal activities of the Humphrey Boys gang and its members. (See, e.g., *Mejia, supra*, 211 Cal.App.4th at p. 616 [jury could reasonably conclude gang members attacked rival in retaliation for disrespect towards gang, and attack elevated gang's reputation].) The evidence showed that the victim had engaged in conduct that merited death in the

view of the Humphrey Boys, that carrying out an order to murder the victim was consistent with Hernandez's station within the Humphrey Boys' hierarchy, and that the shot caller communicated with Hernandez the night before the murder.  This was sufficient to support a finding that Hernandez acted at the shot caller's direction in association with, and for the benefit of the Humphrey Boys.

Officer O'Brien and Detective Santana testified that committing violent criminal acts helped the Humphrey Boys instill fear in the community, and that the timing of the fire to coincide with the Summer Night Lights event sent a strong message to the neighborhood that the Humphrey Boys were in control.  The Humphrey Boys demonstrated that even when police were gathered across the street, they could murder a woman who crossed them execution-style, and then burn her body in a gruesome public display with impunity.  There was substantial evidence that Hernandez's actions benefitted, furthered, and promoted both the Humphrey Boys gang and gang members in their criminal activities by frightening away potential witnesses.

Officer O'Brien's opinion that, in a hypothetical situation mirroring the facts of the instant case, the defendant would be acting for the benefit of, in association with, or at the direction of a criminal street gang was properly rooted in the facts presented, and the jury could reasonably rely upon the opinion in reaching its verdict.

### *Implied Malice Murder of a Fetus*

Hernandez contends that, because the jury was not required to find that he knew the victim was pregnant when he killed her, murder of the fetus was essentially a strict liability offense, which, when used to support a multiple murder special circumstance, violates the Eighth Amendment. Hernandez acknowledges that our Supreme Court has held that there is no requirement that a defendant be aware that the victim is pregnant to be found guilty of fetal murder. In *People v. Taylor* (2004) 32 Cal.4th 863, at page 868 (*Taylor*), the Supreme Court stated: "When a defendant commits an act, the natural consequences of which are dangerous to human life, with a conscious disregard for life in general, he acts with implied malice towards those he ends up killing. There is no requirement the defendant specifically know of the existence of each victim." We are bound by *Taylor* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and decline Hernandez's invitation to urge the Supreme Court to revisit its decision.

### *Section 667.5 Subdivision (b) Prior Prison Term Enhancements*

Hernandez contends, and the People concede, that the three prior prison term enhancements imposed and stayed

pursuant to section 667.5, subdivision (b) must be stricken pursuant to Senate Bill 136. We agree.

On October 8, 2019, the Governor signed Senate Bill 136 into law. The new law, which became effective on January 1, 2020, amends section 667.5, subdivision (b), which formerly imposed a one-year sentence enhancement for each separate prior prison term or county jail term imposed under section 1170, subdivision (h), where the defendant had not remained free of custody for at least five years. (Former § 667.5, subd. (b).) Pursuant to Senate Bill 136, the enhancement now applies only if a defendant served a prior prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (See Stats. 2019, ch. 590, § 1.)

Because Hernandez's sentence was not final when Senate Bill 136 took effect and because his prior offenses were not for sexually violent felonies, we agree with the parties that the amended law applies to him retroactively. (*People v. Herrera* (2020) 52 Cal.App.5th 982, 995–996; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342 (*Lopez*).) We modify the judgment to strike Hernandez's prior prison term enhancements. We need not remand this matter for resentencing. (See *Lopez, supra*, at p. 342.)

## DISPOSITION

Hernandez's three 1-year prior prison term enhancements imposed pursuant to section 667.5, subdivision (b) are stricken.  The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


MOOR, J.

We concur:



RUBIN, P. J.



BAKER, J.